Carol R. KAUFMAN, Moses Marx, and Mel Schnell, Plaintiffs,

v.

The COOPER COMPANIES, INC., Gary A. Singer, Arthur C. Bass, Warren J. Keegan, Brad C. Singer, Steven G. Singer, Bruce D. Sturman and Ralph H. Thurman, Defendants.

The COOPER COMPANIES, INC. and Bruce D. Sturman, Plaintiffs,

v.

Moses MARX, Momar Corp., Theodore H. Kruttschnitt, Mel Schnell, William D. Miller, J. David Hakman, Harold L. Schneider, James E. Gilleran, Jackson L. Schultz, Cooper Development Company, Cooper Life Sciences, Inc., and Parker G. Montgomery, Defendants.

Nos. 89 Civ. 4856 (DNE), 89 Civ. 4867 (DNE).

United States District Court, S.D. New York.

Aug. 1, 1989.

As Amended Aug. 3, 1989.

Weil, Gotshal & Manges, Greg A. Danilow, Richard B. Friedman, Ira A. Finkelstein, and Robert W. Rodriguez, of counsel, Tenzer, Greenblatt, Fallon & Kaplan, and Morgan, Lewis & Bockius, New York City, for Carol R. Kaufman, Moses Marx, Mel Schnell, Momar Corp., Theodore H. Kruttschnitt, William D. Miller, J. David Hakman, Harold L. Schneider, James E. Gilleran, Jackson L. Schultz, Cooper Development Co., Cooper Life Sciences, Inc., and Parker G. Montgomery.

Stroock & Stroock & Lavan, Melvin A. Brosterman, Bruce H. Schneider, Andrew R. Kaplan, and Barry M. Sabin, New York City, of counsel, for The Cooper Companies, Inc., Gary A. Singer, Arthur C. Bass, Warren J. Keegan, Brad C. Singer, Steven G. Singer, Bruce D. Sturman, and Ralph H. Thurman.

## OPINION & ORDER

EDELSTEIN, District Judge:

### BACKGROUND

This litigation arises out of a protracted battle for control of The Cooper Companies, Inc. ("TCC"). TCC is a Delaware corporation with its principal place of business in Palo Alto, California whose shares are publicly traded on the New York and Pacific Stock Exchanges. Until recently, it was engaged in various health care related businesses. In May of 1988, amid financial pressures, it began a divestiture of most of its operating business. As a result of this divestiture, the Company has amassed sub-

stantial cash holdings and must now decide how to invest this cash.

In 1958, Parker G. Montgomery, a party to this litigation, founded Cooper Laboratories, Inc. ("Cooper Labs"). In 1983, Cooper Labs was liquidated and CooperVision, Inc., which later changed its name to TCC, was formed. Two other companies, Cooper Development Corporation ("CDC") and Cooper Life Sciences ("CLS"), were also spun off as separate corporations to Cooper Labs shareholders following the divestiture. Montgomery, who was Chairman of the Board and Chief Executive Officer of Cooper Labs, remained as Chairman of CDC, CLS, and Chief Executive of TCC. In 1988, Montgomery also assumed the Chief Executive position of CDC and CLS.

In early 1988, two sets of brothers, Howard, Wayne, and Bruce Sturman (the "Sturmans") and Steven, Brad, and Gary Singer (the "Singers"), acquired a significant block of TCC common stock. In order to avoid a proxy fight, Montgomery consented to Steven Singer and the Sturmans becoming directors in May of 1988. In July of 1988, Montgomery stepped down as Chairman and Chief Executive officer, the remaining Singer brothers were elected to the Board, and Gary A. Singer became Co-Chairman and Co-Chief Executive with Howard Sturman. In October of 1988, Montgomery relinquished his remaining positions with TCC as director and officer.

In addition to Common Stock, TCC has outstanding Preferred Stock and 10-⅝% Convertible Subordinated Reset Debentures due 2005 ("Debentures"). CDC and CLS, which are Delaware corporations, together own 100% of the outstanding Preferred Stock. These corporations have virtually no current operating businesses. Their main assets are the shares of TCC Preferred Stock.

Between October 31, 1988 and April 30, 1989, shareholder equity in TCC has decreased by approximately $30 million and the company has incurred a net loss applicable to Common Stock of approximately $44 million. In addition, CDC and CLS, through Montgomery, negotiated with TCC during most of 1989 to change the status of the preferred shareholders. Montgomery sought to surrender some of the preferred status of the CDC and CLS in exchange for the participation in profits and voting power that accompanies the ownership of Common Stock. The dispute between CDC and CLS on the one hand, and TCC on the other, centered on a dispute over how much CDC owed TCC and vice-versa as a result of certain loans made while the companies were in related businesses. These negotiations proved unsuccessful because TCC declined to repurchase the Preferred Stock.

One of the last major portions of its business that TCC agreed to sell was its Cooper Technicon, Inc. ("CTI") division to Miles Inc. for $212 million. One of the conditions of closing on that deal was the obtaining of consents from all the shareholders, including the holders of Preferred Stock. By agreement dated October 21, 1988, CDC and CLS eventually gave its consent to the sale of CTI in their capacity as holders of the Preferred Stock. Nevertheless, on March 21, 1989, Montgomery sent a letter on behalf of CDC and CLS purporting to revoke the previously given consents on the ground that certain representations regarding the redemption or repurchase of Preferred Stock had not been honored. A lawsuit in Delaware ("Delaware Litigation") ensued that resulted in a judgment, dated June 15, 1989, declaring the original consents to be valid, enforceable, and irrevocable. On June 22, 1989, the consent of the Common Stockholders was obtained and the sale of CTI was consummated one week later, on June 29, 1989. After the sale of CTI, TCC was left with virtually no operating assets and a substantial amount of cash.

On June 29, 1989, the defendants in the Cooper Action, 89 Civ. 4867 (DNE) formed The Cooper Companies Stockholders' Committee (the "Stockholders' Committee" or the "Committee" or the "Marx Group"). The Committee's goal was to wage a proxy contest for the election of directors at the upcoming Annual Meeting of TCC, scheduled for August 2, 1989. On July 5, 1989, the Committee filed a Proxy Statement

with the Securities Exchange Commission (the "Commission" or "SEC") and issued certain statements to the press through one of the members of the Committee, Theodore H. Kruttschnitt. The Committee proposed its own slate of directors that includes Marx and Kruttschnitt, but does not include Montgomery. On July 6, 1989, TCC management filed its own proxy statement and Notice of Annual Meeting to stockholders.

On July 17, 1989, the instant actions were filed. The plaintiffs in the Kaufman Action, 89 Civ. 4856 (DNE) are three holders of TCC Common Stock. Moses Marx is the largest individual shareholder in TCC, owning approximately 7.0% of the outstanding shares.[1] Marx and Mel Schnell are also members of the Stockholders' Committee. The defendants are TCC and the management nominees for the Board, with the exception of Frederick J. Adler. The plaintiffs in the Cooper Action, 89 Civ. 4867 (DNE) are TCC and Bruce Sturman, a TCC director. The defendants are the participants in the Stockholders' Committee proxy solicitation.

Both parties moved for preliminary injunction. By stipulation and order the parties agreed to participate in expedited discovery and expedited briefing schedule so that the motion could be heard before the August 2, 1989 meeting. On July 27, 1989, the court heard oral argument on the cross-motions for preliminary injunction.[2]

## DISCUSSION

In this circuit, a party seeking a preliminary injunction must demonstrate irreparable injury, and either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party seeking the seeking the injunction. *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025–26 (2d Cir.1985).

### I. Irreparable Injury

■ Both parties to this litigation concur that violations of the Proxy Rules[3] may cause irreparable injury supporting injunctive relief. Federal courts are empowered to "grant all necessary remedial relief" to effectuate the purposes behind Section 14(a) of the Securities Exchange Act. *J.I. Case v. Borak*, 377 U.S. 426, 435, 84 S.Ct. 1555, 1561, 12 L.Ed.2d 423 (1964). By the terms of Section 14(a), violations of the rules promulgated under that section are deemed violations of the Securities Exchange Act. *See Ash v. GAF Corp.*, 723 F.2d 1090, 1092 (3d Cir.1983). Accordingly, the court finds that irreparable injury would flow from the violations of the Proxy Rules alleged by both plaintiffs in this litigation.

### II. Likelihood of Success on the Merits: The Marx Group Motion for Preliminary Injunction

#### A. *Annual Report Accompanying TCC's Proxy Statement*

The Marx Group's first argument is that TCC's proxy solicitation was accompanied by stale financial information that failed to provide shareholders with an accurate description of the Company's current financial status. TCC argues that it has complied with the requirements of the Proxy Rules and, in any event, has provided the disclosure sought by the Marx Group in subsequent mailings to shareholders. For the reasons set forth below, the court finds that the financial information TCC provided to shareholders with its proxy solicitation failed to comply with the relevant rules.

---

1. A portion of this total represents Marx's ownership of the Debentures, which are convertible to shares of Common Stock.

2. The parties agreed that there was no need for an evidentiary hearing because the material facts are not in dispute. Accordingly, the motion has been decided on the affidavits, deposition testimony, and exhibits the parties have submitted.

3. Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), empowers the SEC to promulgate rules to regulate the solicitation of proxies. The Commission's rules are codified at Regulation 14A. 17 C.F.R. § 240.14a *et seq.*

### 1. Requirements of the Proxy Rules

■ The Marx Group contends that the annual report TCC mailed to shareholders with its proxy statement failed to comply with the relevant provisions of the Proxy Rules. Rule 14a–3 of Regulation provides that a proxy solicitation made by management for a stockholders' meeting to elect directors must be "accompanied or preceded by an annual report." 17 C.F.R. § 240.14a–3(b). Subparagraphs (1)–(10) of Rule 14a–3 describe the particular information that must be included in the annual report.

Subparagraph (1) requires the report to include consolidated audited balance sheets for the two most recent fiscal years and audited income statements for the three most recent fiscal years. The annual balance sheets and income statements are to be prepared in accordance with Regulation S–X, except that Articles 3 [4] and 11 of Regulation of S–X shall not apply. Subparagraph (3) requires the annual report to contain the "Supplementary Financial Information" required by Item 302 of Regulation S–K. Item 302, in turn, requires disclosure of certain financial information for the two most recent fiscal years on a *quarterly* basis.[5] In addition, Item 302(a) requires this quarterly information to be provided for any interim period after the last two fiscal years required by Article 3 of Regulation S–X. Finally, Rule 3–12 of Regulation S–X provides that if financial statements are as of a date 135 days or more prior to the proposed mailing date of a proxy statement, the financial statements must be updated.

Not surprisingly, the parties dispute the effect of this labyrinth of regulations. TCC contends that because Rule 14a–3(b)(1) excludes the application of Article 3 of Regulation S–X, Rule 3–12 of that Regulation does not apply to its proxy solicitation and only applies to proxy solicitations for meetings other than those for the election of shareholders. The Marx Group, however, contends that the chain of cross-references among the rules requires application of Rule 3–12 of Regulation S–X to every element of Rule 14a–3. Apparently, the issue has not been directly addressed by a court or by the SEC, and would appear to present a question of first impression.

It is a basic principle of statutory construction that the meaning of a provision should, in the first instance, be gleaned from its text. It is apparent upon reading Rule 14a–3(b) that the entire section is intended to set forth the financial information management must include in the "annual report" that accompanies or precedes its proxy solicitation for a stockholders' meeting for the election of directors. Subparagraph (1) requires a certain type of financial information, namely, yearly balance sheets and income statements. Although TCC is correct that 14a–3 does not require that Article 3 of Regulation S–X be followed, this exclusion is only included in Subparagraph (1). The logical conclusion is that the yearly balance sheets and income statements need not comply with all the provisions of Article 3.

Nevertheless, Subparagraph (3), by incorporating Item 302 of Regulation S–K, requires different information than Subparagraph (1), namely, net sales, gross profit, income and net income. Moreover, this information must be broken down by quarter and must be provided for any interim time period required by Regulation S–X. Therefore, the management must include in the 14a–3 "annual report" the information required by Item 302 for the periods dictated by Rule 3–12 of Regulation S–X—namely, the information must be as current as the latest 10Q statement.

The result is that TCC need not provide updated information for all of the items on its 10K. It should, however, have provided

---

**4.** Rule 14a–3(b)(1) does expressly include three provisions of Regulation S–X that are to be applied: Rules 3–03(e), 3–04, and 3–20. These provisions, however, are not relevant to the present discussion.

**5.** In particular, Item 302(a) requires disclosure of net sales, gross profit, income, net income, per share data for both income and net income. Item 302(c) also requires description, by quarter, of the disposal of any segments of a business and other unusual or extraordinary items. *See* 17 C.F.R. 229.302.

the current data for the information listed in Item 302. Since the only information TCC provided with its proxy solicitation is the 10K as of October 31, 1989, that information would not satisfy the requirements of Rule 14a–3(b).[6]

### 2. Subsequent Disclosure by TCC

■ TCC further contends that even if it were required to provide updated financial information, it met that obligation by mailing to the shareholders its quarterly report on form 10Q and its form 8K. These quarterly reports, however, were sent to shareholders on July 21, 1989, fifteen days after the proxy solicitation material was sent to shareholders.

This delayed disclosure is unsatisfactory in two respects. Rule 14a–3 unequivocally states that the "annual report" must be provided in the form described *prior to or contemporaneously with* the proxy solicitation. As noted *supra,* the 10K dated as of October 31, 1988 did not satisfy the requirements of Rule 14a–3. Although the information supplied in the 10Q contains some of the requisite updated information, that information was not provided to the shareholders until *after* the proxy solicitation was mailed.

Moreover, the purpose of the securities laws generally is to provide information to investors so that they have the opportunity to make informed choices. Rule 14a–3 makes clear that the shareholder should be provided information in a clear, concise, and timely manner so that voting decisions can be intelligently made. This goal of disclosure is not furthered by providing information on an installment basis. Before management may solicit the proxy of a shareholder, it must provide *all* of the relevant information in a timely fashion.

Anything less vitiates the underlying goal of the securities laws in general, and the proxy rules in particular. Accordingly, the court finds that the defects in the financial information provided by TCC have not been cured by subsequent disclosures.

### B. *Statements Regarding the Refusal to Nominate Howard and Wayne Sturman*

■ The Marx Group contends that TCC's proxy statement was materially false and misleading, in violation of Rule 14a–9 of the proxy rules, with respect to its description of the circumstances surrounding the refusal to nominate Howard and Wayne Sturman for reelection as directors. The Marx Group contends, and the deposition testimony of Gary Singer corroborates the contention, that Howard and Wayne Sturman were not nominated by the Board because they refused to sign the June Agreement. TCC responds that sufficient disclosure was made at page 7 of the proxy statement, which states:

> Howard Sturman and Wayne Sturman, who are currently directors of the Company, determined not to enter into the June Agreement and were not nominated for re-election as directors at the Annual Meeting.

Rule 14a–9(a) proscribes statements or omissions of material fact in proxy statements.[7] The Supreme Court has defined the standard of materiality as follows:

> What the standard does contemplate is a showing of substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact

---

6. TCC does not dispute that if Rule 3–12 were to apply, the 10K statement TCC furnished with its proxy solicitation would be out of date.

7. Rule 14a–9 provides in relevant part:
No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is

made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false and misleading.

would have been viewed by the reasonable investor as having significantly altered the "total mix of information made available."

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The question before the court, therefore, is whether a reasonable investor would consider the fact that Howard and Wayne Sturman were not nominated by the Board *because* they declined to sign the June Agreement significant in deciding for whom to vote as directors. The relevant portions of TCC's proxy statement disclose two material facts: (1) that Howard and Wayne Sturman, as shareholders, decided not to sign the June Agreement, and (2) that Howard and Wayne Sturman were not nominated for reelection. The reason why the Board decided not to nominate Howard and Wayne Sturman was not disclosed.

To evaluate the materiality of the omitted statement, the surrounding circumstances are important. The parties agree that the upcoming election for directors is of paramount importance in the future of TCC. The company is at a critical stage; having liquidated most of its assets and reduced a crushing debt burden it is now "cash-rich." TCC will have to decide how to invest that cash and what direction the company will take in the future. Both Sturman brothers were previously elected to the Board. Failure to enunciate why they were not renominated leaves open to question the criteria employed by the Board in making its nominations. There is apparently no question that the Sturmans are otherwise qualified to be directors. The shareholders are entitled to know why they were not nominated in order to make an informed choice in casting their votes.

It may be true that it is the rare proxy statement "whose language could not be improved upon by a judicial craftsman sitting in the serenity of his chambers." *Kennecott Cooner Corp. v. Curtiss–Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978). Nevertheless, a proxy statement is supposed to disclose *facts* in a manner calculated to provide a shareholder who wishes it the information relevant to the question at issue. No fact could be more material to the decision to vote for a particular slate of directors than the reason why an incumbent director has not been nominated for reelection, particularly when the reason may reflect the current nominees' view of their fiduciary duty to the shareholders.

TCC's argument that the June Agreement was among shareholders does not refute the fact that the decision not to nominate was made by the signatories to that agreement as directors. Deposition of Gary A. Singer, Chairman of the Board, at 115. The shareholders should have been informed that the Board based its decision on whom it would nominate on whether those individuals pledged to vote as shareholders in a particular way. Without passing on the propriety or wisdom of that approach, it is, nevertheless, a fact that a reasonable investor would consider significant.

■ The Marx Group also contends that TCC should have disclosed that the decision not to nominate Howard Sturman might entitle him to his severance agreement, which totalled $900,000. Howard Sturman's severance arrangement is adequately disclosed by the TCC Proxy Statement. As of July 27, 1989, Sturman had not requested his severance. The possibility that he might do so in the future is adequately addressed by the disclosure of the agreement and need not have been more fully explained.

Finally the Marx Group contends that TCC should have disclosed that the Sturman brothers declined to sign the June Agreement on advice of counsel. The motivation behind the Sturman's refusal to sign that agreement was also not required. The relevant information is the facts surrounding the Board's decision not to renominate the Sturman's not the subjective motivation for the Sturman's failure to sign the June Agreement.

C. *Alleged 13D Violations by the Directors of TCC*

■ The Marx Group also alleges that the director-signatories to the June Agree-

ment failed to file a timely 13D statement, which must be filed by any person [8] who acquires 5% or more of the outstanding shares of a corporation. 15 U.S.C. § 78m(d). Specifically, the Marx Group contends that the 13D statements were filed after the statutorily prescribed 10 day period and further that the 13D statements failed adequately to disclose the agreement among the directors not to nominate any director who would not sign the June Agreement.

The timeliness issue requires little discussion. The Marx Group seeks an injunction requiring corrective disclosure by the director-signatories. Because the 13D statements have been filed, albeit belatedly, there is no injunctive relief that can be issued by this court to correct the delayed disclosure. The issue as to timeliness is therefore moot.

▉ The challenges that the 13D failed to disclose material facts must likewise be rejected. The main charge levelled by the Marx Group is that the 13D's fail to disclose the agreement among Board members that no individual would be nominated as a director unless he signed the June Agreement. Section 13(d) does not require this fact to be disclosed. Section 13(d)(1)(E) requires disclosure of information relating to "any securities of the issuer." 15 U.S.C. § 78m(d)(1)(E). The oral agreement among the director-signatories was not an agreement relating to TCC securities. Section 13(d) is intended to disclose information regarding accumulation of control over substantial *shares* of the corporation. It is, therefore, not intended as a form of disclosure for decisions by management, but rather as disclosure of arrangements by shareholders *qua* shareholders. Accordingly, the director-signatories were not required to disclose any

agreements among themselves as directors. This of course is not to suggest that the directors' agreement was proper, only that it need not have been disclosed by the 13D filings.

### D. *Failure to Disclose "Change in Corporate Control*

▉ Finally, the Marx Group contends that TCC's proxy statement failed to comply with Item 6(e) of Schedule 14A, which details the information required in a proxy statement by management. 17 C.F.R. § 240.14a–101. The Marx Group's argument is that the control of the Board, based on the voting ·alignments of the directors, shifted to Gary Singer, whereas it was previously divided equally between Singer and Howard Sturman.

Item 6 of Schedule 14A is entitled "Voting Securities and Principal Holders Thereof." Item 6(e) requires disclosure of a "change in control" of the registrant. The information that Item 6(e) requires relates exclusively to transactions in securities.[9] The text of Item 6 in general, and Item 6(e) in particular, makes clear that the Commission contemplated information regarding change in control of voting securities. Accordingly, a change in voting patterns of the Board—even if such had occurred—is not the type of information required to be disclosed by Item 6(e).

### III. TCC's Motion for Preliminary Injunction

In its lawsuit TCC contends that the proxy solicitation mailed by the Marx Group was false and misleading. In addition, TCC contends that the Stockholders' Committee prematurely solicited proxies by virtue of statements made to the press. Finally, TCC argues that the Committee's Schedule 14B failed to disclose unidentified

---

**8.** A person for purposes of Section 13(d) includes any group who by agreement—such as the June Agreement—controls over 5% of the outstanding shares of a corporation. By signing the June Agreement, the director-signatories became a person required to file a 13D statement.

**9.** If a change in control has occurred, Item 6(e) requires disclosure of:

the person(s) who acquired such control, the amount and the source of the consideration used by such person or persons, the basis of the control, the date and a description of the transaction(s) which resulted in the change of control and the percentage of voting securities of the registrant now beneficially owned directly or indirectly by the person(s) who acquired control, and the identity of the person(s) from whom control was assumed.

agreements with respect to the Preferred Stock.

### A. *Allegations Regarding the Marx Group's Proxy Statement*

#### 1. Failure to Disclose the Factual Background of the Proxy Contest

■ TCC first contends that the Marx Group's proxy statement is false and misleading, in violation of Rule 14a–9. The essence of TCC's allegation is that the Marx Group should have disclosed to the shareholders that it sought to improve the position of the preferred shareholders. More specifically, TCC contends that the Marx Group was obligated to disclose that CDC and CLS, as preferred shareholders, withheld their consent to the sale of CTI. In addition, TCC contends that the Marx Group should have disclosed the Delaware Litigation over the consents. By failing to provide this information, TCC concludes that the Marx Group misled the shareholders as to the true motivation for seeking their proxies.

A review of the proxy material mailed by the Marx Group reveals a significant amount of disclosure regarding its goals and intentions with respect to the proxy contest. Both the cover letter and the proxy statement itself state that the preferred shareholders on the Stockholders' Committee seek a change in their status. Several alternative courses of action are set forth with respect to the preferred stock. The proxy statement also clearly discloses that unsuccessful negotiations for conversion of the preferred stock precipitated the formation of the Stockholders' Committee.

Stripped of hyperbole and rhetoric, TCC is arguing that the Marx Group should have described each step in the negotiations between TCC and the Marx Group with respect to the preferred shares. Their basis for this position is that the shareholders should be told that one of the Marx Group's main motivations in waging the proxy contest is to seek a change in the status of the preferred shareholders. As the proxy statement reads now, that motivation is clearly stated. It is also clear that the Stockholders' Committee was formed because the negotiations over the preferred stock failed to bear fruit.

The standard of materiality has been discussed *supra*. To read the requirements of the Proxy Rules to require a round by round synopsis of the negotiations goes too far. The Proxy Rules are intended to require disclosure of facts that a reasonable investor would consider significant. The material fact at issue, according to TCC, is that the Marx Group sought to work out an arrangement for the preferred shareholders. That fact was adequately disclosed to make plain to the reasonable investor the goals sought to be advanced by the Stockholders' Committee.

#### 2. The Role of Parker G. Montgomery

■ TCC also contends that the Marx Proxy Statement does not accurately reflect the role of Parker G. Montgomery in the proxy solicitation, thereby violating Rule 14a–3. 17 C.F.R. § 240.14a–3. The Marx Proxy Statement, however, makes several references to Montgomery's role. On page three the statement makes clear that "Mr. Parker G. Montgomery may be deemed to be a participant in the Proxy Solicitation in his capacity as the Chairman of the Board and President of both CDC and CLS." On the same page it states that "Mr. Montgomery has participated and will continue to participate in decision making and negotiations involving the Committee." The Marx Proxy Statement goes on to state at page 8 that Montgomery has no agreements with the Committee regarding his serving as a Director or officer of the Company, and further that Montgomery does not intend to participate actively in the management of the company.

In light of these disclosures, it is unclear what exactly TCC seeks as additional information. The excerpts summarized *supra* fully disclose that Montgomery has an active role in the solicitation by virtue of his position as Chairman and chief executive officer of CDC and CLS. The Marx Proxy Statement also discloses the financial support provided by CDC and CLS to the solicitation as Schedule 14B requires.

TCC contends further that certain statements purportedly made by Theodore H. Kruttschnitt and reported in various newspapers are false and misleading with respect to Montgomery's role. Specifically, Kruttschnitt apparently stated that "[Montgomery's in favor of what's happening, but he's definitely not a part of it, he's not controlling it and there are no plans for him to be a participant in [TCC's] management." *See* Sabin Affidavit Ex. 25. The only portion of the statement that is arguably false and misleading is that Montgomery is "definitely not a part of it."

Taken alone, this statement might raise some questions. When taken in context, however, the statement is not misleading. Montgomery, in fact, is not a member of the Stockholders' Committee. He is a participant in the solicitation only in his capacity as officer and director of CDC and CLS. The rest of Kruttschnitt's statement clearly indicates its import—namely, that Montgomery is not personally organizing the Committee and that in any event, he does not intend to participate actively in TCC management. Moreover, the plenary disclosure in the Proxy Statement clarifies any possible ambiguity raised by Kruttschnitt's statements, as quoted in the press.

 The alleged discrepancies in the deposition testimony of members of the Stockholders' Committee are also immaterial to the issue at stake. The question is whether the proxy solicitation material of the Marx Group is materially false and misleading. The fact that Montgomery may have testified falsely about the amount of effort he has expended on the proxy contest is simply not relevant. The issue is whether the Proxy Statement misrepresents his role, and the court finds it does not do so.

### 3. Alleged Charges of Improper, Illegal and Immoral Conduct

 TCC further contends that certain statements made by Kruttschnitt to the press violate Rule 14a–9. Rule 14a–9(b) contains a note that sets forth four examples of types of statements that "depending upon particular facts and circumstanc-es, may be misleading within the meaning of this rule." One of the examples refers to "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation."

Kruttschnitt's purported statements referred to a "Change in Control" amendment to the indenture governing the TCC's Debentures as illegal and "morally indefensible." CDC filed a lawsuit against TCC over the disputed indenture provision. The TCC board subsequently rendered that provision inapplicable because of the cost it would have incurred if the management changed as a result of the annual meeting scheduled for August 2, 1989. The factual foundation of Kruttschnitt's statements was presumably the lawsuit that had been filed by CDC, which raised allegations that the provision was illegal. Rule 14a–9 only precludes groundless accusations of illegality. Such a factual foundation would be sufficient to make those charges, thereby not violating Rule 14a–9.

### B. *Alleged Premature Solicitation by the Marx Group*

 Rule 14a–11(c)(1) provides that no proxy solicitation may be made by any person other than the registrant until at least five business days after the filing with the Commission of the requisite Schedule 14B. The Proxy Rules and relevant case law broadly define the term "solicitation" in the proxy context. Rule 14a–1(k) provides, *inter alia*, that a "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy" constitutes a proxy. 17 C.F.R. § 240.14a1–(k). This definition encompasses not only direct requests for proxies but those "communications which may indirectly accomplish such a result or constitute a step in a chain of communications designed ultimately to accomplish such a result." *SEC v. Okin*, 132 F.2d 784, 786 (2d Cir.1943) (Hand, J.); *see Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 796 (2d Cir.1985) (quoting *Okin*).

Applying these standards it would appear that the statements by Mr. Kruttschnitt reported in the press, as well as the press release issued by the Stockholders' Committee on July 5, 1989, would constitute a "solicitation." The press release states that proxies will be solicited when the applicable law permits, presumably after five days have expired. The quotations in the press do not directly or indirectly request proxies. Nevertheless, these statements and press release clearly express an intent to solicit proxies. Moreover, these communications speak critically of the incumbent management and clearly express some of the reasons why the Stockholders' Committee was formed and would seek to solicit proxies. Taken in the context of the upcoming proxy contest these statements must be viewed a "step in the chain of communications" ultimately seeking shareholders' proxies for the upcoming Annual Meeting.

In light of the nature of these communications, the court finds that the Marx Group solicited proxies prematurely, in violation of Rule 14a–11.

### C. *Misleading Statements in Schedule 14B*

TCC alleges that the Schedule 14B filed by the Marx Group fails to disclose information about agreements among the participants in the proxy contest with respect to the preferred shares. TCC, however, fails to specify what agreements have not been disclosed by the Marx Group. After the conclusory statement that the Schedule 14B fails disclose such agreements, TCC's brief does not mention these purported agreements.

In addition, TCC contends that the 14B falsely states that the Stockholders' Committee first entered into an oral agreement on June 29, 1989. In support of this assertion, TCC cites to various deposition transcripts. The excerpts cited by TCC, however, demonstrate only that, prior to June 29, 1989, a proxy contest was discussed among various members of the Committee as a possible course of action. They do not, however, demonstrate a likelihood that there was such an agreement before that

date. Accordingly, the court finds that TCC has not shown a likelihood of success on the merits of the 14B claim.

### IV. Relief

As discussed above, both movants have demonstrated a likelihood of success on the merits of at least one of their claims. The Marx Group has demonstrated a likelihood of success on their claims that TCC's proxy statement was accompanied by outdated financial information and that the proxy statement itself was materially misleading with respect to its characterization of the failure to renominate Howard and Wayne Sturman as directors. TCC has demonstrated a likelihood of success on the merits of its claim that the Stockholders' Committee prematurely solicited proxies by means of statements made to the press and a press release, both issued on the same day its proxy statement was filed with the Commission.

 The question now is what remedy the court is to fashion. Courts traditionally have broad discretion in fashioning equitable remedies to see that justice is done. The main harm the parties have caused has been to deprive shareholders of the opportunity to make a decision on how to cast their votes on the basis of timely, accurate, and comprehensible information. TCC has furnished misleading and outdated information to its shareholders. The Stockholders' Committee began soliciting proxies before the time permitted by the SEC.

The main interest the court must protect is the right of shareholders to be furnished the opportunity to make an informed decision. It is apparent that the Annual Meeting cannot go forward as scheduled and it is hereby enjoined. The misleading proxy statement and outdated information furnished by TCC taint the proxies that they have obtained. The premature solicitation by the Stockholders' Committee are less damaging to the rights of shareholders. Nevertheless, since it is impossible to assess the effect those premature communications had on its solicitation effort, permitting the Committee to retain those proxies would also render the contest unfair. Accordingly, the only solution is to void all the proxies obtained by each side and to

recommence the process of soliciting proxies for a rescheduled shareholders' meeting.

In addition, the background of this battle for corporate control strongly suggests that future transgressions may occur. The stakes are high and the temptation to gain advantage is strong. Accordingly, to dissuade the parties from future transgressions of the securities law, they are hereby enjoined from future violations of Section 14(a) and all applicable provisions of the securities laws and SEC regulations in connection with the proxy solicitation for a rescheduled annual meeting.

The court recognizes the cost and burden inherent in such a remedy. Nevertheless, the rights of corporate suffrage outweigh the economic hardship imposed by the remedy. Moreover, although it may not be a consolation to the parties, it is their own actions that have placed them in the position in which they now find themselves.

## CONCLUSION

For the foregoing reasons, plaintiffs' motions for preliminary injunction are granted to the extent set forth above. The TCC Annual Meeting for August 2, 1989 is hereby enjoined. The proxies solicited to date by both TCC and the Stockholders' Committee are hereby voided.

SO ORDERED.