**Tammy NEWMAN, Plaintiff,**

v.

**Russell F. WARREN, Russell F. Warren, Jr., Patrick J. Wack, Jr., Ronnie P. Barnes, William E. Lipner, Robert B. Milligan, Jr., John Sculley, Stephen F. Wiggins, Professional Sports Care Management, Inc. and Healthsouth Corporation, Defendants.**

**Civil Action No. 15008.**

Court of Chancery of Delaware,
New Castle County.

Submitted: Aug. 15, 1996.
Decided: Aug. 19, 1996.
Revised: Aug. 21, 1996.

Joseph A. Rosenthal, and John G. Day, of Rosenthal, Monhait, Gross & Goddess, Wilmington; Stanley D. Bernstein, of Bernstein, Liebhard & Lifshitz, New York City, of counsel, for Plaintiff.

Alan J. Stone, and William M. Lafferty, of Morris, Nichols, Arsht & Tunnell, Wilmington; George Wailand, and David L. Barres, of Cahill Gordon & Reindel, New York City, of counsel, for Defendants Russell F. Warren, Russell F. Warren, Jr., Patrick J. Wack, Jr., Ronnie P. Barnes, William E. Lipner, Robert B. Milligan, Jr., John Sculley, Stephen F. Wiggins and Professional Sports Care Management, Inc.

Rodman Ward, Jr., Anthony W. Clark, and Paul J. Lockwood, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for HEALTHSOUTH Corporation.

ALLEN, Chancellor.

The core substantive issue presented on this application for a temporary restraining order concerns the question whether the fiduciary duty of candor, which corporate directors owe to shareholders when the board recommends shareholder action, requires disclosure of the substance of board deliberations in connection with adopting the board resolution making such a recommendation. The question comes up in the context of a board recommendation to the shareholders of Professional Sports Care Management, Inc.

("PSCM") that they approve a stock for stock merger. As the pending application is one for a restraining order, it poses all the kind of questions—irreparable harm, balance of equities, laches—that are typically presented by such motions.

The restraining order now sought would enjoin the vote upon a stock for stock merger between PSCM, a Delaware corporation, and HEALTHSOUTH Corp., which is also a Delaware corporation. HEALTHSOUTH is not alleged to be affiliated with PSCM by reason of common ownership, or otherwise. Defendants who constitute the board of directors of PSCM, own approximately 28% of the outstanding stock of PSCM. Under the terms of the proposed Plan and Agreement of Merger all shareholders will receive .233 shares of HEALTHSOUTH common stock for each share of PSCM. The proposed merger is scheduled to be voted upon by the shareholders of PSCM at a special meeting of shareholders to be held on August 20, 1996 at Greenwich, Connecticut.

This action is brought by Tammy Newman, the owner of 100 shares of PSCM common stock. Ms. Newman brings the suit individually and on behalf of all public shareholders of PSCM. The gist of her position on this application is that the proxy statement issued by the Company fails to disclose facts material to the forthcoming shareholder vote. Specifically she claims:

(1) that the PSCM shareholders are not informed *of the reasons* that one of the directors of PSCM (Mr. Wiggins) at a May 12, 1996 PSCM board meeting opposed board action to further pursue negotiations with HEALTHSOUTH respecting a possible acquisition by that firm; it is not disputed that it is disclosed that Mr. Wiggins opposed the transaction;

(2) that the shareholders have not been informed why at that same meeting another PSCM director (Mr. Milligan) who is affiliated with Mr. Wiggins abstained from expressing a view on that question;

(3) that shareholders have not been informed why these two and another director (Mr. Barnes) were absent from the board meeting of May 16 at which the

board did approve and recommend the transaction now to be presented to the shareholders; and

(4) that shareholders have not been informed in the Proxy Statement of certain family relationships among PSCM directors nor of all of the material terms of certain consulting agreements for two of the officer/directors of the company that are contemplated in the event the proposed merger is consummated.

Each of these alleged omissions is said to be material to a shareholder decision to approve or not the proposed merger agreement.

Defendants deny the material aspects of these claims. In addition they assert that in all events they do not state a claim upon which relief may be granted. Specifically they assert that they fully disclosed the board's actions and factors affecting its recommendation and that all material facts respecting the consulting agreements are fully set out. Beyond the merits of the claims, defendants assert that the entry of a restraining order would threaten more harm than good. The board determined for good reason that a sale at this time might be advantageous and went through a careful, well-advised process to find potential buyers. Only the HEALTHSOUTH proposal eventuated and an injunction interfering with the timely effectuation of that transaction would expose that transaction and the company's shareholders to market risk that the terms of that transaction would no longer be available. Thus, according to defendants, absent a compelling case of material false disclosure, an acknowledgment of the relative information available to the board, to plaintiff and to the court, and an orientation to protecting the real economic interests of the class would counsel denial of the pending application. Finally defendants assert that Ms. Newman is guilty of laches that should preclude the court from granting equitable relief at this time.

For the reasons set forth below, I conclude that plaintiff has failed to show sufficient likelihood of a meritorious disclosure claim to justify the assumption of the risks to the class, to the other PSCM shareholders and to the interests of HEALTHSOUTH that granting a TRO would necessarily entail.

## I.

The following facts are assumed to be true for purposes of this motion. In stating the relevant facts for purposes of this TRO hearing, I am, of course, not making judicial findings.

PSCM is a provider of outpatient physical therapy and rehabilitation services in the New York, New Jersey and Connecticut tri-state area. As of June 30, 1996, PSCM had consolidated assets of $53,840,000, and consolidated stockholders' equity of $43,230,000. HEALTHSOUTH is the nation's largest provider of outpatient surgery and rehabilitative health care services. It provides these services through a national network of over 900 outpatient, surgery and rehabilitative health care facilities in forty-five states.

PSCM is a relatively new company that has grown in important part through acquisition. Due to acceleration of the rate of change in the health care industry over the past few years, PSCM management determined that it was advisable that the corporation investigate possible business combinations. Thus, during the late spring of 1995, PSCM began discussions with the investment banking firm Unterberg Harris and with others about strategic options. Unterberg Harris was asked to explore strategic alternatives. In that connection it investigated possible mergers. Approximately seven potential bidders, including HEALTHSOUTH, entered into confidentiality and standstill agreements with PSCM. Although PSCM and others conducted preliminary due diligence during this period, no material negotiations were undertaken and no proposals were made or received.

In December 1995, representatives of HEALTHSOUTH and PSCM met at the invitation of Smith Barney, Inc., HEALTHSOUTH's financial advisor. Thereafter, in February and March of 1996, representatives of PSCM and HEALTHSOUTH held additional informational meetings, and in early April began preliminary negotiations about a potential business combination. As the nego-

tiations with HEALTHSOUTH grew more serious, Unterberg Harris contacted three additional potential bidders (including one who had previously expressed an interest in a possible combination). One party did conduct due diligence, but thereafter informed Unterberg Harris that it would not be in a position to make a competing bid. No other party conducted due diligence nor did PSCM receive any proposals.

On May 12, 1996, the PSCM board met to consider the status of the negotiations with HEALTHSOUTH. PSCM's board is comprised of eight persons: Dr. Russell F. Warren (a founder of the company), his son Russell F. Warren, Jr., Patrick J. Wack, Jr., Ronnie P. Barnes (also a founder), William Lipner, Robert B. Milligan, Jr., John Sculley and Stephen F. Wiggins. There are interrelationships on the board in addition to that of the Warrens. Mr. Sculley is Dr. Warren's brother in law and Mr. Wack is Mr. Sculley's son in law. Stephen Wiggins, is the CEO of Oxford Health Plans, Inc., a large public managed care company and Mr. Milligan, is the CEO of a merchant banking house who is also a director of Oxford Health Plans. William G. Lipner is CEO of a market research firm.

During the May 12 meeting, according to both parties, certain board members—particularly, Messrs. Wiggins and Milligan—questioned whether the HEALTHSOUTH proposal ascribed any value to PSCM's ownership interest in OrthoNet, a start-up independent physicians association focused on orthopedics, in which PSCM owns a 51% interest. In addition, the directors raised questions whether PSCM could spin-off OrthoNet to PSCM's stockholders without affecting the pooling-of-interests accounting treatment for the merger which was a material condition of the HEALTHSOUTH proposal. In addition, according to the proxy and accepted by all parties, at the meeting, some significant discussion and disagreement among board members (principally

Messrs. Wiggins and Warren and Dr. Warren) occurred.

Ultimately, at the May 12 meeting, the board (1) directed management to explore a possible spin-off of OrthoNet and the effects such a spin-off might have on HEALTHSOUTH's proposal, and (2) voted to authorize representatives of PSCM to conduct appropriate due diligence of HEALTHSOUTH and to negotiate forms of definitive agreements. As set forth below, the proxy statement reports that director Wiggins "opposed" further negotiations with HEALTHSOUTH. It does not detail why he did so. Mr. Milligan was reported to have abstained from the May 12 vote.

During the period May 12–15, PSCM and HEALTHSOUTH conducted additional negotiations and discussions, apparently including discussions regarding the possibility of spinning-off OrthoNet. On May 16, after written notice, the PSCM board met to consider the HEALTHSOUTH merger proposal. That proposal contemplated a stock for stock merger in which each share of PSCM would be converted into .233 shares of HEALTHSOUTH common stock.[1] Directors Wiggins, Milligan and Barnes did not attend this meeting. The proxy statement for the impeding special meeting of shareholders does not state why they did not attend (and this is now asserted as one of its fatal defects). After presentations by financial and legal advisors, including the delivery of a fairness opinion by Unterberg Harris, the members of the PSCM board who were present voted unanimously to approve the merger and the voting proxies, and authorized PSCM to execute and deliver the merger agreement.

On May 22, shortly after the issuance of a press release announcing the proposed merger, plaintiff filed her original complaint, alleging that the consideration to be received by PSCM stockholders was "unfair and grossly inadequate." The proxy statement became

1. There are provisions protecting the negotiated price from market fluctuations to some extent. If the price of HEALTHSOUTH's stock declines below $31.00 per share, PSCM has the right to terminate the merger subject to HEALTHSOUTH's right to propose a revised merger consideration. In addition, if HEALTHSOUTH's average stock price rises above $38.625 per share during the measuring period, the exchange ratio will be adjusted downward so that PSCM shareholders receive less HEALTHSOUTH stock.

available to the public at the SEC on July 19, and was sent to PSCM's stockholders on July 23, 1996. On August 7, 1996, plaintiff moved for a restraining order on the basis that the disclosure of the proxy solicitation was incomplete in a material respect. The matter was heard as an application for a TRO, without plaintiff being afforded the ability to take depositions or otherwise use compulsory process to investigate her suspicions.

## II.

The claim is unusual. It is not that the proxy contains any false statement or that it omits to disclose an identified statement of fact that is needed in order to render that which is stated true are not misleading. Rather, it is that there *are some grounds* for the judgment of one or two directors who did not vote in favor of the transaction at the May 16 meeting and who opposed going forward with negotiation of the merger, and those grounds are not adequately set forth. Nor are any reasons set forth why these directors did not attend the final board meeting at which the transaction was approved.

The disclosure that is made concerning the background of the merger includes the following (emphasis added):

On May 12, 1996, the Board of Directors of PSCM met to consider the status of the negotiations with HEALTH-SOUTH and discussed, among other things, the business of HEALTHSOUTH and its proposal. In advance of the meeting, the Board had been informed of the subject matter for the forthcoming meeting and had been provided a memorandum from Unterberg Harris describing various valuation methodologies related to the proposal and relevant statistics relating to comparable companies and transactions as well as a memorandum from legal counsel describing the Board's fiduciary responsibilities. At the meeting, legal counsel for PSCM discussed with the Board of Directors its fiduciary obligations with respect to consideration of any proposed business combination. Also at the meeting, a representative of Unterberg Harris provided its preliminary view as to the fairness of the transaction to PSCM's stockholders, from a financial point of view, explained each aspect of its memorandum in detail and responded to questions from various Board members with respect to its analysis, the structure and terms of the proposed Merger, and the weight ascribed to various components of PSCM's value, including OrthoNet. In addition, there was a discussion of Unterberg Harris's and certain of its principals' historic relationship with, and equity interest in, PSCM.

*Various Board members, particularly Messrs. Stephen F. Wiggins and Robert B. Milligan, Jr., questioned whether the HEALTHSOUTH proposal ascribed any value to PSCM's ownership interest in OrthoNet. In addition, questions were raised as to whether a spin-off of OrthoNet to PSCM's stockholders was possible* without affecting the pooling-of-interests accounting treatment for the transaction which was a material condition of the HEALTHSOUTH proposal. *In addition, some significant discussion and disagreement among Board members (principally, Messrs. Wiggins and Warren and Dr. Warren) centered on the long-term prospects for companies of PSCM's size with similar access to capital whose core business is the operation of rehabilitation clinics,* given increased penetration of managed care providers and materially lower average reimbursement rates. *The Board also discussed the difficulties in continuing to execute PSCM's acquisition strategy while at the same time expanding its business focus.* After concluding the discussion, the Board of Directors directed management to explore a possible spin-off of OrthoNet and the effects such a spin-off might have on HEALTHSOUTH's proposal and the pooling-of-interests accounting treatment of the proposed Merger. In addition, the Board of Directors authorized representatives of PSCM to conduct an appropriate due diligence investigation of HEALTHSOUTH and to negotiate forms of definitive agreements which would include voting proxies to be delivered by Dr. Warren and Messrs. Barnes, Warren and Wack. *The foregoing Board action was opposed by Mr. Wiggins. Mr. Milligan*

*abstained in view of his role as a member of the Board of Managers of OrthoNet.*

On May 13, 14 and 15 additional negotiations and discussions were held with HEALTHSOUTH with respect to the proposed combination. Topics included a possible OrthoNet spin-off and the effect such a spin-off would have on the pooling-of-interests accounting treatment for the Merger. HEALTHSOUTH informed Mr. Warren that PSCM's majority interest in OrthoNet was incorporated in, and not separable from, its proposal. In addition, HEALTHSOUTH advised Mr. Warren that any risk to the pooling-of-interests accounting treatment would result in a withdrawal of HEALTHSOUTH's offer, and that HEALTHSOUTH was not in a position to fully evaluate whether such a spin-off would adversely affect such treatment. Management of PSCM also contacted its independent accounting firm, Price Waterhouse LLP, to discuss various alternatives to address the Board's questions with respect to a potential OrthoNet spin-off. No substantive suggestions were made that effectively addressed the concerns raised by HEALTHSOUTH and PSCM continued to negotiate the definitive documentation with a view toward the scheduling of a subsequent special meeting of the PSCM Board of Directors late on May 15, 1996 or early on May 16, 1996. Prior to such meeting, members of the Board of Directors were provided with substantially final forms of the merger agreement and voting proxies as well as a memorandum from counsel describing the material terms of the transaction.

Early on May 16, 1996, the Board of Directors met at a special meeting to consider the merger proposal from HEALTH-SOUTH. At such meeting, PSCM's financial and legal advisors discussed with the Board of Directors their review of HEALTHSOUTH on behalf of PSCM and the terms of the proposed consolidation. In addition, Unterberg Harris delivered its oral opinion to the Board of Directors that, as of such date, the proposed consideration to be received in the Merger by the holders of PSCM Common Stock was fair, form a financial point of view, to such holders.

After discussion, the members of the Board of Directors of PSCM present at the meeting unanimously approved the Merger, the voting proxies and authorized PSCM to execute and deliver the merger agreement. (*Messrs. Wiggins, Barnes and Milligan were not in attendance.*)

PSCM Proxy Statement at 21–22.

### III.

Before addressing the merits of the motion, I note first the legal test applicable to this motion for a temporary restraining order. There are various formulations of the applicable test that this court has employed. All of these formulations look to three factors principally in informing the court's discretion: the imminence and significance of plaintiffs claim of irreparable injury; the probable merits of plaintiffs claim; and the risks to defendant in the event a restraining order were issued and it ultimately were determined that the restraining order was improvidently issued. The articulation of a specific formulation of these factors may differ with respect to the emphasis that each element is accorded. Thus in *Cottle v. Carr*, C.A. No. 9612, 1988 WL 10415 (Del.Ch.1988) for example this court emphasized that since such applications are for a limited period and are often heard without plaintiff having had any discovery or defendant having had an opportunity to present evidence, the court is often not in a position to responsibly say much at all about the merits of the claim. Thus, quite naturally in such circumstances, the main emphasis will be upon those aspects of the test that look to the competing claims of irreparable injury. In other cases brought as a TRO, circumstances do permit the parties and the court to responsibly make a more informed judgment concerning the merits of the claim. Affidavits of both sides may sometimes be submitted even though the application is for a TRO and held on a day or two notice. In such cases the court has stated the elements of the equitable test is something akin to the traditional preliminary injunction formulation. *Hecco Ventures v. Sea Land Corp.*, C.A. No. 8486, 1986 WL 5840 (Del.Ch.1986). How the Court of Chancery, in the exercises of its discretionary

judgment, balances the foregoing elements in a particular case will necessarily incorporate a complex judgment reflecting the unique blend of timing considerations, consideration of the nature and extent of the risk of injury to both sides should relief be granted or denied, and consideration of the merits to the extent conditions allow.

In this instance I conclude that the claim of the plaintiff on the merits is far too weak to justify the risks that entry of a restraining order would entail.

## IV.

■ This motion involves a claim that the reasons why two directors did not affirmatively endorse a transaction that a majority of the board recommends to the shareholders must be, but have not been, disclosed in the company's proxy statement. This claim of a duty to disclose is interesting and deserves thoughtful consideration because if it is valid the law of disclosure will encounter certain logical as well as practical problems. These problems may not dictate an answer to the policy question, whether such disclosure is required, but they are certainly relevant to considering whether the claimed duty exists. The problems I refer to arise in part from the fact that a corporation's board of directors is an artificial, collegial body, upon whom legal rights and responsibilities are conferred.[2] This fact creates a practical and logical difficulty in stating the reasons why a collective body acted by vote. The fact is that while "voters" (directors, or legislators or appellate judges or other collective deciders) may agree, according to the rules of their process, on the outcome, they need not agree on reasons. Each member may have a complex set of reasons that lead to his or her vote. Those reasons may or may not overlap with some reasons of other members who also voted in the same way, but they may differ in emphasis, in detail or they may in fact differ radically while leading to the same vote.[3] It is of course not necessary that all directors (or appellate judges or members of a legislature etc.) agree on the reasons for an outcome. It is only necessary that, according to the particular institutional rules applicable, the requisite number of them do agree on the desirability of the outcome.

*Disclosure* of "reasons" for board action implicates a similar problem.[4] Of course, as a practical matter in relatively small groups (the three judges of an appellate panel for example) the problem may not be so great because the number of voters is small and in fact the "voters" may agree on the essential reasons for the decision. Thus a *statement of reasons* might be agreed to by such a collectivity at the time of the vote. But ordinarily, the larger the number of voters, the more superficial the statement of reasons would need to become in order to reflect the "reasons" of all voters who concur in the action. Of course, disclosure of reasons for board action may in some instances be unproblematic. Given the particular circumstances, the members of the collectivity may easily (cheaply and quickly) agree concerning a statement of reasons (if there is any reason for them to do so). But in many circumstances they could not do so cheaply except at a very superficial level of meaning. A similar problem exists with respect to those whose analysis leads them to vote against, when there are several such voters. When

---

2. Thus, under the corporation law of this State "the business and affairs of every corporation organized under this chapter shall be managed by or under the direction of the board of directors ...". 8 Del.C. Sec. 141(a). If the certificate of incorporation is to be amended the first necessary step is the adoption of a resolution by the corporation's board of directors adopting the amended language and declaring its advisability. 8 Del.C. Sec. 242(b). If a merger is to be effectuated the board of directors must adopt a resolution so providing and recommend action to shareholders. 8 Del.Ch. Sec. 251(b). In these and all of its official acts a board acts formally, at a meeting and by a vote.

3. This fact, for example, is one of the obvious problems in the use of various sources of legislative history in order to construct a meaning for legislative language voted upon by a large number of representatives.

4. The problem may be addressed at a verbal level by creating an essentially empty or conclusory statement of reasons, such as "to do so is in the best interests of the institution" or, in the case of corporations "its shareholders".

there is only a single dissenter the logical problem disappears with respect to his or her reasons. What remains, under that circumstance, in a regime in which a directors reasons—as opposed to the facts respecting the company and the transaction—are regarded as material matter for disclosure, is what principle will define the limit of that obligation.

■ These logical and practical problems with formulating and disclosing "reasons" for director votes or decisions are avoided, in my opinion, by the existing law of fiduciary disclosure because that law requires full and candid disclosure of *all material facts. Zirn v. VLI Corp.,* 621 A.2d 773 (Del., 1993); *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929 (Del., 1985); *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). It does not in my opinion require in addition that individual directors state (or the corporation state for them) the grounds of their judgment for or against a proposed shareholder action. As indicated above, in some circumstances it may not be problematic to state at a meaningful level of specificity the reasons that were shared by the members of the board in making a recommendation. The board or the corporation may of course in all events choose to state reasons for a board recommendation. If that is done, the statement of those reasons must, of course, be true and not misleading.

Plaintiff has not cited any case in which a disclosure has been found defective because, while stating all of the material facts of the underlying transaction, it does not fully state the ground for a disclosed director dissent. Certainly the citation *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) is of no assistance to plaintiff here. There the Supreme Court said that a statement of belief "by corporate directors about a recommended

course of action, or an explanation of their reasons for recommending it" may be material. 501 U.S. at 1090, 111 S.Ct. at 2756–2757. Such a statement is true obviously. If a board does undertake to formulate and disclose a statement of reasons for its recommendation, shareholders can be expected to put some weight upon such a statement. To so recognize is not to imply that the board has an obligation to state or summarize a single statement of reasons why its recommendation is as it is. Far less does it imply that the fairness requires the board to disclose the details of the various discussions and deliberation of the various board members, whether they concurred in the action of the whole board or dissented. What is required is that the material facts relating to the company and the transaction be fully disclosed.[5] Plaintiff does cite *Kaufman v. Cooper Companies, Inc.,* 719 F.Supp. 174, 180 (S.D.N.Y.1989) in support of her assertion that the board has an obligation to set forth reasons for its proposed action. In *Kaufman* the court held that Section 14(a) of the Securities Exchange Act had been violated when management disclosed in a proxy fight that two directors (1) had refused to sign a certain agreement and (2) were not renominated for board service by management. It was held that the proxy was defective in not stating that the directors in question were not renominated *because* they had not signed the agreement. This fact that the failure to nominate was a reprisal was thought to be material to how shareholders might vote in the contested election. *Kaufman* thus involves not simply a failure to state the reasons for board action but the existence of a material fact—the reprisal—which itself might be relevant to a contested election.

Plaintiff has presented no substantial indication that any material fact has not been

---

5. One of plaintiffs claims of nondisclosure involved the absence of director Barnes from the final May 15 meeting that approved the merger. The proxy statement does not state why he (or Wiggins and Milligan) was not present. The motion contains several statements of deep curiosity by plaintiff. Why was not Mr. Barnes at the meeting? It is suggested that perhaps he was "coerced" into not attending, even though plaintiff noticed that the proxy stated that he intended to vote his stock in favor of the transaction. Plainly this subject is speculation that is immaterial to an evaluation of the transaction, but in any event, an affidavit now establishes that Mr. Barnes, fortunate man, was sailing of the coast of Greece on May 15 when the board meeting occurred. As to why Wiggins and Milligan were not present the proxy statement does not say and I cannot regard it, in the circumstances disclosed by the statement, as material under the law.

disclosed with respect to the meetings of May 12 and May 16. Her application provides no basis in this respect to issue the order sought.

■ The only other significant disclosure item concerns various aspects of two consulting agreements between Mr. Warren Jr. and HEALTHSOUTH and between Mr. Wack and HEALTHSOUTH. With respect to the claim that the proxy statement does not disclose the family relationships involving Mr. Warren and Mr. Wack, given the relatively modest size of these contracts and the disclosure of the family relationships in all relevant SEC filings of PSCM I cannot conclude that inclusion of this information in the proxy statement would affect the total mix of information available to shareholders in a material way. Nor can I conclude that there was an obligation to restate the annual compensation of these officers so that a shareholder could compare that amount to the amount to be gained through the consulting contract in order to evaluate the weight to be accorded to those directors recommendation. The inference that would be drawn is lighter than air; an advocate's invention; real investors could not regard this argument as affecting a material element of their analysis of the proposed transaction, in my opinion.

For these reasons I cannot conclude that shareholder interests would be well served by the issuance of the restraining order sought. The application will therefore be denied.