**ACE LIMITED, a Cayman Islands limited liability company, Plaintiff,**

v.

**CAPITAL RE CORPORATION, a Delaware Corporation, Defendant.**

**Civil Action No. 17488.**

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 25, 1999.
Decided: Oct. 25, 1999.
Revised: Oct. 28, 1999.

Gregory P. Williams, Robert J. Stearn, Jr., Megan Semple Greenberg, of Richards, Layton & Finger, Wilmington, Delaware, for Plaintiffs.

Kenneth J. Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Defendants.

## OPINION

STRINE, Vice Chancellor.

Plaintiff ACE Limited ("ACE") has filed a motion requesting a temporary restrain-

ing order ("TRO") against defendant Capital Re Corporation ("Capital Re"). ACE requests that I issue an order that restrains Capital Re from taking any action to terminate the June 10, 1999 Agreement and Plan of Merger between and among ACE, Capital Re, and CapRe Acquisition Corporation (the "Merger Agreement"). Capital Re's board of directors wishes to terminate the Merger Agreement and accept an all cash, all shares bid that it believes is financially superior to the Merger Agreement. ACE contends that Capital Re cannot, under the Merger Agreement's no-talk and termination provisions, validly terminate the Merger Agreement.

Because Capital Re's argument that termination is permitted by the Merger Agreement is the more plausible one; because ACE's contrary construction, if correct, suggests that the Merger Agreement's "no-talk" provision is likely invalid; and because the risk of harm to Capital Re stockholders outweighs the need to protect ACE from irreparable injury, I deny ACE's motion.

## I. *Factual Background*

### A. *ACE and Capital Re Enter Into A Merger Agreement*

Capital Re, a Delaware corporation, is a specialty reinsurance corporation in the business of municipal and non-municipal guaranty reinsurance, mortgage guaranty reinsurance, title reinsurance, and trade credit reinsurance. ACE is a Cayman Islands holding company that, through subsidiaries, engages in the insurance and reinsurance industries internationally.

According to ACE, Capital Re was in a capital crunch earlier this year. Although Capital Re does not admit that this was the reason, it says that for more than a year it has been exploring a possible business combination or capital infusion. During this exploration, Capital Re engaged ACE in discussions about strategic options. As a result of those discussions, ACE provided Capital Re with a cash infusion of $75 million in February 1999 in exchange for newly issued Capital Re shares, which ultimately amounted to 12.3% of the company's outstanding common shares.

This infusion was apparently insufficient to calm the markets because in March of 1999 Moody's Investors Service, Inc. downgraded Capital Re's financial rating from AAA to AA2. ACE contends that a further downgrading would have seriously affected Capital Re's earnings and that Capital Re therefore contacted ACE in May of 1999 to discuss solutions, including a possible business combination with ACE.

Negotiations following this contact bore fruit in the form of the binding Merger Agreement between ACE and Capital Re, which was publicly announced on June 11, 1999. The terms of the Merger Agreement provide for Capital Re stockholders to receive .6 of a share of ACE stock for each share of Capital Re they hold. On June 10, 1999, the value of .6 of a share of ACE was over $17.00.[1]

### B. *The Merger Agreement's "No–Talk" And "Fiduciary Out" Provisions*

At the time the Capital Re board executed the Merger Agreement, it knew that ACE, which owns 12.3% of Capital Re's stock, had stockholder voting agreements with stockholders holding another 33.5% of Capital Re's shares. According to ACE, "[r]epresentatives of Capital Re significantly participated in the negotiation of, and in obtaining, the shareholder agreements" and Capital Re encouraged the 33.5% holders to sign the agreements.[2] These agreements obligated the 33.5% holders to support the merger *if the Capital Re board of directors did not terminate the Merger Agreement in accordance with its provisions.* Put simply, ACE would control nearly 46% of the vote going into

---

**1.** Silver Aff., ¶ 5.

**2.** Mears Aff., ¶ 3.

the merger vote and therefore needed very few of the remaining votes to prevail. Thus the Capital Re board knew when it executed the Merger Agreement that unless it terminated the Merger Agreement, ACE would have, as a virtual certainty, the votes to consummate the merger even if a materially more valuable transaction became available.

Although ACE and Capital Re both agree that the merger, if effectuated, will not result in a "change of control" of Capital Re within the meaning of the Delaware Supreme Court's opinion in *Paramount Communications v. QVC*,[3] the merger is obviously a transaction of great significance for Capital Re's stockholders and for ACE. The parties therefore bargained over the circumstances in which the Capital Re board could consider another party's acquisition or merger proposal and/or terminate the Merger Agreement.

For its part, ACE says it wanted the "strongest, legally binding commitment from Capital Re, consistent with the Capital Re board's fiduciary duties."[4] This was natural given the investment ACE had made in Capital Re and the significant resources and organizational energy necessary to consummate the merger. Most of all, ACE viewed the merger as a unique strategic opportunity enabling it to expand into a specialized reinsurance market that is, in ACE's view, quite difficult to enter from scratch.

On the other hand, the Capital Re board knew that the "fiduciary out" in the Merger Agreement was crucial if it was to protect its stockholders' rights. Because ACE had contracts in hand guaranteeing it success in a merger vote unless the Capital Re terminated the Merger Agreement, the board's decision whether to terminate was determinative. Capital Re suggests that the stockholder agreements with the 33.5%

holders were tied to this termination provision purposely, so that if there was a proposal that the Capital Re board deemed "superior," the 33.5% holders would also be free to consider it.[5] Because the merger would be consummated even if circumstances had greatly changed and even if a much more valuable offer was available unless the board could validly terminate the agreement, Capital Re claims that the board was careful to negotiate sufficient flexibility for itself to terminate the Merger Agreement if necessary to protect the Capital Re stockholders.

The negotiations on this issue resulted in two important sections of the contract. The first, § 6.3 (the "no talk"), generally operates to prohibit Capital Re and "its officers, directors, agents, representatives, advisors or other intermediaries" from "solicit[ing], initiat[ing], encourag[ing], ... or tak[ing] any action knowingly to facilitate the submission of any inquiries, proposals, or offers ... from any person."[6] Of most importance on this motion, § 6.3 also restricts Capital Re from participating in discussions or negotiations with or even providing information to a third party in connection with an "unsolicited bona fide Transaction Proposal," unless the following conditions are met:

- Capital Re's board concludes "in good faith ... based on the advice of its outside financial advisors, that such Transaction Proposal is reasonably likely to be or to result in a Superior Proposal";

- Capital Re's board concludes "in good faith ... based on the written advice of its outside legal counsel, that participating in such negotiations or discussions or furnishing such information is required in order to prevent the Board of Directors of the Company from breaching its fiduciary duties to its stockholders

3. *Paramount Communications Inc. v. QVC Network Inc.,* Del.Supr., 637 A.2d 34 (1994).

4. ACE Br. at 3.

5. Silver Aff., ¶ 3; *see also* Mears Aff. ¶ 3 (Capital Re involved in negotiating the stockholder agreements).

6. Merger Agreement, § 6.3.

under the [Delaware General Corporation Law]";

- the competing offeror enters into a confidentiality agreement no less favorable to Capital Re than its confidentiality agreement with ACE, a copy of which must be provided to ACE; and

- the company's directors provide ACE with contemporaneous notice of their intent to negotiate or furnish information with the competing offeror.[7]

Section 6.3 is therefore the logical gateway through which the Capital Re board must pass in order to position themselves to terminate the Merger Agreement under § 8.3.[8] Section 8.3 of the Merger Agreement, in turn, enables the Capital Re board to terminate the Merger Agreement only if, among other things:

- Capital Re "is not in material breach of any of the terms of [the] Agreement";

- the Capital Re board "authorizes [Capital Re] ... to enter into a binding written agreement concerning a transaction that constitutes a Superior Proposal and [Capital Re] notifies [ACE] in writing that it intends to enter into such an agreement, attaching the most current version of such agreement to such notice";

- ACE "does not make, prior to five business days after receipt of [Capital Re's] written notification ... an offer that the [Capital Re] Board ... determines, in good faith after consultation with its financial advisors, is at least as favorable, as the Superior Proposal, taking into account the long term prospects and interests of [Capital Re] and its stockholders";

- Capital Re, prior to such termination, pays ACE a $25 million termination fee.[9]

### C. ACE's Stock Takes A Beating

Since the merger was announced on June 11, 1999, ACE has seen the price of its stock fall significantly. As a result, the value of the consideration the marketplace deemed Capital Re stockholders to be receiving in the merger dropped precipitously to less than $10 a share on October 6, 1999.[10]

It was under these less than auspicious economic circumstances that the merger headed for an October 7, 1996 vote.

### D. XL Capital Limited Makes An Unsolicited Higher Bid And Capital Re Decides To Terminate The Merger Agreement

On October 6, 1999—a day before the stockholder vote on the merger—Capital Re's board of directors received an offer from XL Capital Ltd., a Bermuda-based insurer, to purchase 100% of the company's stock for $12.50 a share. Based on the price of ACE's stock that day, the market considered the merger significantly less valuable for Capital Re stockholders than the XL Capital offer.

In the face of this offer, the Capital Re board immediately convened an emergency meeting. At that meeting, the board received written advice from their outside counsel, Michael J. Silver of Hogan & Hartson, that entering into discussions with XL Capital was "consistent with" their fiduciary duties.[11] The written advice did not say that the board was "required to" discuss the XL Capital offer in order to fulfill their fiduciary duties. But Silver gave oral advice at the meeting that was stronger and that reflected the general tenor of advice he had earlier given in a lengthy May 1999 memorandum explaining to the board its fiduciary obligations in the context of entering the Merger Agreement

---

**7.** Merger Agreement, § 6.3.

**8.** That a third party would consummate a superior proposal under § 8.3 without negotiations with or material information from Capital Re strikes me as highly implausible.

**9.** Merger Agreement, §§ 8.3, 8.5.

**10.** The Merger Agreement has an upper "collar" but no lower one.

**11.** Silver Aff., Ex. B.

with ACE. The minutes of the meeting state:

> Mr. Silver stated that the ACE transaction was originally viewed by the Board as a strategic merger not involving a sale of control; accordingly, the Board was not required to accept a cash offer even if its current value was nominally higher than the value of the ACE shares received in the merger. *However, he noted that the Merger Agreement specifically contemplated consideration of certain competing offers and that it was appropriate, if the Board considered the XL offer to be reasonably likely to result in a Superior Proposal, for the Board to conclude that consideration of the XL offer is required in order to satisfy its fiduciary obligations to stockholders.*[12]

In an affidavit, Silver explains that his hastily prepared (given the exigencies) and more equivocal letter opinion reflected his judgment that whether the board was required to explore the XL Capital offer hinged on its business judgment that the XL Capital offer was attainable and likely to yield a higher value than the merger. Until this judgment was made, he could not opine that such exploration was required.[13] By his letter opinion, Silver claims, he was opining that if the board made such a judgment, then a decision by the board that discussions with XL Capital were required was an appropriate one under Delaware law.[14]

After considering Silver's advice, the board determined that the value of the XL Capital offer was so substantially superior to the merger that it was duty-bound to enter discussions with XL Capital.[15] As a result of those discussions, XL Capital raised its bid to $13.00 on October 10, 1999. That same day, the Capital Re board met and received presentations from its investment banker, Goldman Sachs, and its legal advisors. The Capital Re board concluded that the XL Capital offer was more advantageous to Capital Re than the merger. As a result, Capital Re sent written notice to ACE that it considered the $13.00 offer a "superior proposal" within the meaning of the Merger Agreement and that it intended to terminate the Merger Agreement pursuant to § 8.3 unless ACE increased the merger consideration within five business days.

ACE claims that in the spirit of compromise and despite what it regarded as a clear breach of contract by Capital Re, it offered on October 14 to increase the merger consideration so that Capital Re stockholders would receive a combination of ACE stock and cash with a value at least equal to $13.00 a share and in some instances yielding a value somewhat higher. ACE apparently formalized that bid on October 18, 1999.

That same day, XL Capital increased its all cash, all shares bid to $14.00. This resulted in Capital Re sending another termination notice to ACE, giving ACE five days to match XL Capital's offer. The deadline for ACE to match that offer expires today, October 25, 1999.

Rather than match the latest XL Capital offer, ACE filed this action on October 21, 1999 seeking to enjoin Capital Re from terminating the Merger Agreement. Argument on this motion was held earlier today.

## II. *The Contentions Of The Parties*

ACE argues that Capital Re has violated the plain language of the Merger Agreement. Its major claim is that Capital Re was forbidden to engage in discussions with XL Capital unless it received written legal advice from outside counsel opining that the board's fiduciary duties mandated such discussions. Because the board did not receive such advice, its decision to enter negotiations with XL Capital

---

**12.** Silver Aff., Ex. A.

**13.** Silver Aff., ¶ 12.

**14.** *Id.*

**15.** *Id.*, Ex. A.

and to start a bidding war between ACE and XL Capital is, in ACE's view, a clear breach of contract.

ACE further contends that the only appropriate remedy for this breach is an injunction against termination of the Merger Agreement. Because its contracts with the 33.5% holders are binding only so long as the Capital Re board does not terminate the Merger Agreement in accordance with § 8.3, ACE fears that it will never be able, as a practical matter, to bind the 33.5% holders to their contract, even if I later find that Capital Re breached § 6.3 of the Merger Agreement and therefore had no right to terminate under § 8.3.

As a matter of black letter law, ACE points out that the opportunity to merge with or acquire another corporation is a sufficiently unique one, which, if wrongfully denied, gives rise to harm not easily quantifiable in monetary damages. Put another way, ACE faces irreparable harm if Capital Re terminates. These principles apply with full force here, ACE says, because Capital Re is one of only two highly rated specialty reinsurers in the United States, and the specialty reinsurance industry is difficult to enter.

Moreover, ACE argues that it will be placed in a maddening situation without an injunction. If Capital Re can terminate, ACE contends, then ACE will face a Hobson's choice. If ACE decides to bid in an auction for Capital Re and prevails, it will obviously be able to reap the benefits of its win. But it will never be able to recover monetary damages for breach of the Merger Agreement in that circumstance be-

cause, by its acquisition of Capital Re, its only source of damages would be from itself.[16] On the other hand, if ACE stays out of an auction, it will be forced to accept the inadequate remedy of monetary damages and will lose the unique opportunity to acquire Capital Re.

Finally, ACE submits that it is critical for this court to act because of Capital Re's financial condition. As ACE puts it:

> At present, the ratings agencies remain concerned about Capital Re's financial strength because of the uncertainty and delay created by the auction process. Capital Re also has just announced another significant loss which should heighten the concern of the rating agencies. A further downgrade would negatively impact [sic] Capital Re's revenues, business opportunities, and ultimately the value and the viability of the Company. . . .
>
> If Capital Re experiences any additional downgrades in its ratings, Capital Re will suffer further catastrophic injuries. Thus, if the Merger is allowed to be terminated—even if it is reinstated after trial—or if there is any further delay in the consummation of the merger, the resulting downgrade would result in ACE receiving "damaged goods." [17]

Capital Re, of course, takes a quite different view. It argues that § 6.3 of the Merger Agreement leaves the determination of whether the board must enter discussions with another offeror to the board's own good faith judgment. Although the board is required to consider the written advice of outside counsel in that process, the board must ultimately

---

**16.** In this regard, I note that ACE seems to implicitly acknowledge the theoretical impossibility of bringing a suit, á là the famous or infamous (depending on your point of view) *Pennzoil* case, against XL Capital for tortious interference with the Merger Agreement. *See Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768 (Tex.Ct.App.1987). The Merger Agreement is governed by Delaware law. Because the Merger Agreement specifically contemplates that Capital Re could entertain other offers and in some circumstances could validly dis-

cuss such offers and abandon the Merger Agreement if such an offer were "superior" and unmatched by ACE, a claim that XL Capital was legally forbidden from making such an offer seems far-fetched, if not outrageous. If such a claim is plausible, then the fiduciary out in the contract is, of course, useless.

**17.** ACE Br. at 16–17 (citations omitted).

make its own decision. According to Capital Re, its board did just that because the economic disparity between the value of the merger and the XL Capital offer was so great that the board could not, in good conscience, fail to consider it. In so determining, the board was conscious that if it did not consider the XL Capital offer, it could never go on to consider whether to terminate the Merger Agreement in accordance with § 8.3. Without such a termination, the board knew that ACE would have the voting power to consummate the merger even if the merger was no longer in the best interests of Capital Re's other stockholders. Moreover, Capital Re asserts, the totality of the legal advice given to the board by Silver supported a good-faith determination that consideration of the XL Capital offer was required.

Capital Re also contends the balance of the equities tilts heavily in its favor. If a temporary restraining order issues, the court will chill an ongoing auction and potentially deprive the Capital Re stockholders of the opportunity to take advantage of an offer significantly more valuable than the merger. Furthermore, given the financial difficulties Capital Re has experienced, the delay could result in the bidding going in the other direction or in XL Capital walking away. By its own terms, the XL Capital offer expires on October 27, 1999 at 5:00 p.m. If XL Capital walks away because a TRO is in place, Capital Re fears that its stockholders could be stuck with the merger and lose the opportunity for the nearly $125 million, or 38%, in additional value available under the XL Capital offer.

### III. Standard Of Review

This matter comes before me on ACE's motion for a temporary restraining order.

A TRO is an injunction, and the factors relevant to determining whether to issue a TRO are similar to those relevant when determining whether to grant a preliminary injunction. But these factors are ordinarily given different weight in the TRO context.

■ This stems from the fact that when this court determines whether to grant a TRO, it usually has little time to digest the merits. It therefore rightly concentrates on whether the absence of a TRO will permit imminent, irreparable injury to occur to the applicant and whether that possibility of injury outweighs the injury that the TRO itself might inflict on the defendants.[18] In a case where this balance tilts in favor of the applicant and where a responsible consideration of the merits cannot be had, this court will issue a TRO even though the applicant has only raised claims that "are colorable, litigable, or ... raise questions that deserve serious attention."[19]

Even so, there is "[n]o hard and fast rule governing the extent to which a court may feel able to delve into the merits on such an application."[20] Where circumstances permit the parties and the court "to responsibly make a more informed judgment concerning the merits of the claim," the court may pay greater attention to the first element such that the standard more closely resembles that for a preliminary injunction.[21]

In this case, it is difficult to put aside the merits when analyzing whether the equities, on balance, support the issuance of the order ACE seeks. Capital Re fears that if a TRO issues, XL Capital may walk away, as it has the right to do, on October 27. According to ACE itself, time is of the essence, because Capital Re may soon an-

**18.** *Cottle v. Carr*, Del. Ch., C.A. No. 9612, mem. op. at 5–7, 1988 WL 10415, at *2–3, Allen, C. (Feb. 9, 1988).

**19.** *Id.*, mem. op. at 8, 1988 WL 10415, at *3.

**20.** *Id.* mem. op. at 7, 1988 WL 10415 at *3.

**21.** *Newman v. Warren*, Del. Ch., 684 A.2d 1239, 1244 (1996); *see also Insituform Technologies, Inc. v. Insitu, Inc.*, Del. Ch., C.A. No. 17013, 1999 WL 240347, at *7, Strine, V.C. (Apr. 19, 1999).

nounce or experience adverse financial results that will materially affect its value. These possibilities mean that the issuance of the TRO could pose a threat of real harm to Capital Re's stockholders.

The risks attendant to a judicial delay of the fluid negotiation process now being managed by the Capital Re board should occur only if there is a real likelihood that, after considering the evidence developed by the parties during expedited discovery, I would continue the delay through the issuance of a preliminary injunction. If the court is already in a good position to make a reasoned assessment of the merits and the equities, then it seems irresponsible to expose the parties to the substantial risks that would flow from a TRO.

Here, the parties agree about most of the material facts and disagree primarily about what the language of the contract means. Even in this expedited context, the record is well developed enough to permit a responsible, if necessarily tentative, consideration of the merits.[22] Perhaps most important, the record is sufficiently developed for the court to assess the probable balance of the equities that would be struck at a hypothetical preliminary injunction hearing at which ACE is assumed to have demonstrated a "reasonable probability of success" on its claim that Capital Re breached its contract by negotiating with XL Capital about its offer.

For these reasons, I will give more weight to the merits than is traditionally the case on a motion for a TRO.

### IV.  *Legal Analysis*

#### A.  *ACE's Merits Showing Weighs Against Issuance Of The TRO*

In analyzing the merits, it is useful to break down the analysis into two parts. First, I will discuss what is in my view the probable better interpretation of the contract. Second, I will discuss the implica-

tions of reading the contract the way ACE contends it should be read.

1.  *The Probable Better Interpretation Of The Merger Agreement Is That Capital Re's Discussions With XL Capital Were Proper Under § 6.3*

█ Although perhaps not so clear as to preclude another interpretation, § 6.3 of the Agreement is on its face better read as leaving the ultimate "good faith" judgment about whether the board's fiduciary duties required it to enter discussions with XL Capital to the board itself. Though the board must "base" its judgment on the "written advice" of outside counsel, the language of the contract does not preclude the board from concluding, even if its outside counsel equivocates (as lawyers sometimes tend to do) as to whether such negotiations are fiduciarily mandated.

Here, the Capital Re board had good economic reason to believe that consummation of the merger in the face of the XL Capital offer was adverse to the interests of the Capital Re stockholders. The board knew that if it did not explore the XL Capital offer, the Capital Re stockholders—including the 33.5% holders—would be forced into the merger even though the merger's value had plummeted since June 10, 1999 and even though the XL Capital offer was more valuable. Given these circumstances, it seems likely that in the end a fact-finder will conclude that the board had a good faith basis for determining that it must talk with XL Capital and not simply let the Capital Re stockholders ride the merger barrel over the financial falls. Furthermore, even if the contract is read as ACE wishes, Silver's written legal advice, when taken as a totality, coupled with his oral advice, and viewed in light of the necessarily hurried deliberative process undertaken by the Capital Re board on October 6, 1999, might well be found to be a sufficient basis for a good faith decision by the board.

22.  *Newman,* 684 A.2d at 1244.

## 2. If ACE's Interpretation Of The Merger Agreement Is Correct, § 6.3 Is Likely Invalid And ACE Has Little Chance Of Prevailing On The Merits

■ But ACE, of course, contends that it specifically bargained for the language requiring the Capital Re board to "base" its judgment on the "written advice" of outside counsel so as to lock up the merger as tightly as legally permissible. At this stage, it would be presumptuous to contend that the contract is not susceptible of this reading. Moreover, although Silver's affidavit plausibly explains his rather equivocal October 6 written advice, the inference ACE advocates—that Silver did not have a sufficient good faith belief that discussions with XL Capital were legally mandated to issue a written opinion to that effect—is one that might ultimately be proven correct.

Therefore, it is important that I consider that ACE's interpretation of the contract and the facts may be the best one and determine whether the TRO should issue in that light. Looked at even in that way, however, ACE is not in any better position to obtain a TRO, for reasons I now explain.

In an article soon to be published in the *Cardozo Law Review,* Professor Paul Regan has carefully considered the contract, agency, and trust law principles that provide guidance to help courts determine when it is appropriate to decline to enforce a contract between one party and another.[23] As Professor Regan points out, there are many circumstances in which the high priority our society places on the enforcement of contracts between private parties gives way to even more important concerns.

One such circumstance is when the trustee or agent of certain parties enters into a contract containing provisions that exceed the trustee's or agent's authority. In such a circumstance, the law looks to a number of factors to determine whether the other party to the contract can enforce its contractual rights. These factors include: whether the other party had reason to know that the trustee or agent was making promises beyond her legal authority; whether the contract is executory or consummated; whether the trustee's or agent's *ultra vires* promise implicates public policy concerns of great importance; and the extent to which the other party has properly relied upon the contract.[24] Generally, where the other party had reason to know that the trustee or agent was on thin ice, where the trustee's or agent's breach has seriously negative consequences for her ward, and where the contract is as yet still unperformed, the law will not enforce the contract but may award reliance damages to the other party if that party is sufficiently non-culpable for the trustee's or agent's breach.[25]

Indeed, Restatement (Second) of Contracts § 193 explicitly provides that a "promise by a fiduciary to violate his fiduciary duty *or a promise that tends to induce such a violation is unenforceable on public policy grounds.*"[26] The comments to that section indicate that "[d]irectors and other officials of a corporation act in a fiduciary capacity and are subject to the rule in this Section."[27] It is therefore perhaps unsurprising that the Delaware law of mergers and acquisitions has given primacy to the interests of stockholders in being free to maximize value from their ownership of stock without improper compulsion from executory contracts entered into by boards—that is,

---

**23.** Paul L. Regan, *Great Expectations? A Contract Law Analysis For Preclusive Corporate Lock–Ups,* 21 Cardozo Law Rev. 1 (Oct. 1999) (forthcoming).

**24.** *See generally id.*

**25.** *Id.*

**26.** Restatement (Second) of Contracts § 193 (1981) (emphasis added).

**27.** *Id.,* cmt. a.

from contracts that essentially disable the board and the stockholders from doing anything other than accepting the contract even if another much more valuable opportunity comes along.

But our case law does not do much to articulate an explicit rationale for this emphasis on the rights of the target stockholders over the contract rights of the suitor. The Delaware Supreme Court's opinion in *Paramount v. QVC* comes closest in that respect. That case emphasizes that a suitor seeking to "lock up" a change-of-control transaction with another corporation is deemed to know the legal environment in which it is operating. Such a suitor cannot importune a target board into entering into a deal that effectively prevents the emergence of a more valuable transaction or that disables the target board from exercising its fiduciary responsibilities. If it does, it obtains nothing.

For example, in response to Viacom's argument that it had vested contract rights in the no-shop provision in the Viacom–Paramount Merger Agreement, the Supreme Court stated:

> The No–Shop Provision could not validly define or limit the fiduciary duties of the Paramount directors. To the extent that a contract, or a provision thereof, purports to require a board to act or not to act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable. Despite the arguments of Paramount and Viacom to the contrary, the Paramount directors could not contract away their fiduciary obligations. Since the No–Shop Provision was invalid, Viacom never had any vested contract rights in the provision.[28]

As to another invalid feature of the contract, the Court explained why this result was, in its view, an equitable one:

Viacom, a sophisticated party with experienced legal and financial advisors, knew of (and in fact demanded) the unreasonable features of the Stock Option Agreement. It cannot be now heard to argue that it obtain vested contract rights by negotiating and obtaining contractual provisions from a board acting in violation of its fiduciary duties.... Likewise, we reject Viacom's arguments and hold that its fate must rise or fall, and in this instance fall, with the determination that the actions of the Paramount Board were invalid.[29]

In his article, Professor Regan persuasively articulates how *QVC* can be explained in view of the major factors traditionally applied in contract, agency, and trust law to determine whether to enforce a contract that contains provisions that are fiduciarily improper or that result from a fiduciary breach. He recommends that courts consider four factors when examining whether an acquiror's or merger partner's contract rights should give way to the need to protect the target company's stockholders from a fiduciary breach. Although Professor Regan concentrates on the application of this analysis in the specific context of a corporate change of control where so-called *Revlon* duties are implicated, the logical force of his analysis is appropriately brought to bear in this context, which although not so clearly as a change of control transaction an "ownership" rather than an "enterprise" issue, certainly implicates many of the same policy concerns.[30] As a literal matter, a stock-for-stock merger in which stockholders are required to exchange their existing property for another form of property would seem to be an "ownership" issue.

The factors Professor Regan identifies are: "(1) whether the acquiror knew, or should have known, of the target board's

---

**28.** *QVC,* 637 A.2d at 51 (citation omitted).

**29.** *Id.*

**30.** *Id.* at 91–98 (discussing the difference between enterprise issues (e.g., what product to manufacture) and more fundamental ownership issues affecting stockholder property rights).

breach of fiduciary duty; (2) whether the ... transaction remains pending or is already consummated at the time judicial intervention is sought; (3) whether the board's violation of fiduciary duty relates to policy concerns that are especially significant; and (4) whether the acquiror's reliance interest under the challenged agreement merits protection in the event the court were to declare the agreement unenforceable." [31] The first three of these factors commend themselves to me as a sensible framework for weighing the equities in this context, and their application supports my conclusion that ACE is unlikely to prevail on the merits even if ACE is correct about what the Merger Agreement means.[32]

First, consideration of whether ACE should have known that § 6.3 was so restrictive that the Capital Re board could not properly agree to it necessarily requires an examination of its actual operative effect. If § 6.3 of the Merger Agreement in fact required the Capital Re board to eschew even discussing another offer unless it received an opinion of counsel stating that such discussions were required, and if ACE demanded such a provision, it is likely that § 6.3 will ultimately be found invalid. It is one thing for a board of directors to agree not to play footsie with other potential bidders or to stir up an auction. That type of restriction is perfectly understandable, if not neces-sary, if good faith business transactions are to be encouraged. It is quite another thing for a board of directors to enter into a merger agreement that precludes the board from considering any other offers unless a lawyer is willing to sign an opinion indicating that his client board is "required" to consider that offer in the less than precise corporate law context of a merger agreement that does not implicate *Revlon* but may preclude other transactions in a manner that raises eyebrows under *Unocal*.[33] Such a contractual commitment is particularly suspect when a failure to consider other offers guarantees the consummation of the original transaction, however more valuable an alternative transaction may be and however less valuable the original transaction may have become since the merger agreement was signed.[34]

In one sense, such a provision seems innocuous. I mean, can't the board find someone willing to give the opinion? What is wrong with a contract that simply limits a board from discussing another offer unless the board's lawyers are prepared to opine that such discussions are required?

But in another sense, the provision is much more pernicious in that it involves an abdication by the board of its duty to determine what its own fiduciary obligations require at precisely that time in the life of the company when the board's own judgment is most important.[35] In the

---

**31.** *Great Expectations,* at 115.

**32.** Professor Regan's fourth factor does not bear one way or the other on whether the TRO should be granted. That factor only goes to whether ACE should, upon a final determination that Capital Re breached § 6.3, at least receive reliance damages. Because ACE demanded § 6.3 and knew of its possible, if not likely, invalidity, this would cut against ACE's claim. In any event, the Merger Agreement already provides ACE with a $25 million payment in the event of termination. Thus the only question in the end will be whether the court should go further and award additional damages.

**33.** *Unocal Corp. v. Mesa Petroleum Co.,* Del. Supr., 493 A.2d 946 (1985).

**34.** It may well be a different matter for a board to agree to put a merger agreement to a vote if there are no other provisions tied to the agreement that operate to preclude the stockholders from freely voting down the merger and accepting another deal or opting for no deal at all. In this regard, see the recent amendment to 8 *Del. C.* § 251(c) enabling a board to agree to put a merger to a vote even where its recommendation about the merger has changed.

**35.** *Cf.* 8 *Del. C.* § 141(a) (unless statute or corporation's certificate of incorporation provides otherwise, corporation's business and affairs must be managed by or under the direction of the board of directors); *see also Jackson v. Turnbull,* Del. Ch., C.A. No. 13042,

typical case, one must remember, the target board is defending the original deal in the face of an arguably more valuable transaction. In that context, does it make sense for the board to be able to hide behind their lawyers?

More fundamentally, one would think that there would be limited circumstances in which a board could prudently place itself in the position of not being able to entertain and consider a superior proposal to a transaction dependent on a stockholder vote.[36] The circumstances in this case would not seem to be of that nature, because the board's inability to consider another offer in effect precludes the stockholders (including the 33.5% holders) from accepting another offer. For the superior proposal "out" in §§ 6.3 and 8.3 of the Merger Agreement to mean anything, the board must be free to explore such a proposal in good faith. A ban on considering such a proposal, even one with an exception where legal counsel opines in writing that such consideration is "required," comes close to self-disablement by the board. Our case law takes a rather dim view of restrictions that tend to produce such a result.[37]

Indeed, ACE admits that it pushed Capital Re to the outer limits of propriety, but it claims to have stopped short of pushing

Capital Re beyond that limit. But as I read ACE's view of what § 6.3 means in the context of this Merger Agreement, ACE comes close to saying that § 6.3 provides no "out" at all.[38] According to ACE, it is now clear, per *QVC*, that a board need not obtain the highest value reasonably available unless it decides to engage in a change of control transaction.[39] The ACE–Capital Re merger is not a change of control. Therefore, this syllogism goes, there is no circumstance in which the Capital Re board must consider another higher offer to fulfill its fiduciary duties.[40] Thus Capital Re could not get its outside counsel to issue such an opinion, and the board's contrary judgment of its duties could not have been in good faith.[41] *QVC*, Q.E.D.

There are at least two problems with such logic. As an initial matter, this interpretation renders § 6.3 meaningless, a result that as a matter of contract construction is disfavored and lends support to my conclusion that Capital Re's construction is the better one.

As a matter of corporate law, *QVC* does not say that directors have no fiduciary duties when they are not in "*Revlon*-land." *QVC* simply defines when a board enters *Revlon*-land and is required to seek the highest available value. But *QVC* does not

mem. op. at 10, 1994 WL 174668, at *5, Berger, V.C. (Feb. 8, 1994) (finding that board of directors impermissibly delegated to a third party their statutory responsibility to determine the appropriate consideration in a merger transaction), *aff'd*, Del.Supr., 653 A.2d 306 (1994); *Field v. Carlisle Corp.*, Del. Ch., 68 A.2d 817, 820 (1949) (board of directors may not delegate, except as may be explicitly authorized by statute, the duty to determine the value of the property acquired as consideration for the issuance of stock).

**36.** One legitimate circumstance may be where a board has actively canvassed the market, negotiated with various bidders in a competitive environment, and believes that the necessity to close a transaction requires that the sales contest end. But where a board has not explored the marketplace with confidence and is negotiating a deal that requires stockholder approval and would result in a change

in stockholder ownership interests, a board's decision to preclude itself—and therefore the stockholders—from entertaining other offers is less justifiable.

**37.** *See, e.g., QVC*, 637 A.2d at 51; *cf. Quickturn Design Systems, Inc. v. Shapiro*, Del. Supr., 721 A.2d 1281 (1998) (poison pill that could not be redeemed by new board of directors was invalid because it improperly divested the board of their statutory authority and duty to manage the affairs of the corporation).

**38.** ACE Br. at 9–10.

**39.** *Id.*

**40.** *Id.*

**41.** *Id.*

say that a board can, without exercising due care, enter into a non-change of control transaction affecting stockholder ownership rights and imbed in that agreement provisions guaranteeing that the transaction will occur and that therefore absolutely preclude stockholders from receiving another offer that even the board deems more favorable to them. Put somewhat differently, *QVC* does not say that a board can, in all circumstances, continue to support a merger agreement not involving a change of control when: (1) the board negotiated a merger agreement that was tied to voting agreements ensuring consummation if the board does not terminate the agreement; (2) the board no longer believes that the merger is a good transaction for the stockholders; and (3) the board believes that another available transaction is more favorable to the stockholders. The fact that the board has no *Revlon* duties does not mean that it can contractually bind itself to sit idly by and allow an unfavorable and preclusive transaction to occur that its own actions have brought about. The logic of *QVC* itself casts doubt on the validity of such a contract.

In this necessarily hurried posture, it is impossible to examine in depth the appropriate doctrinal prism through which to evaluate the "no-talk" provision in the Merger Agreement. In the wake of *QVC*, parties have tended to imbed provisions[42] in stock-for-stock mergers that are intentionally designed to prevent another bid-

der, through a tender offer or rival stock-for-stock bid, from preventing the consummation of a transaction.[43] When corporate boards assent to provisions in merger agreements that have the primary purpose of acting as a defensive barrier to other transactions not sought out by the board, some of the policy concerns that animate the *Unocal* standard of review might be implicated. In this case, for example, if § 6.3 is read as precluding board consideration of alternative offers—no matter how much more favorable—in this non-change of control context, the Capital Re board's approval of the Merger Agreement is as formidable a barrier to another offer as a non-redeemable poison pill. Absent an escape clause, the Merger Agreement guarantees the success of the merger vote and precludes any other alternative, no matter how much more lucrative to the Capital Re stockholders and no matter whether the Capital Re board itself prefers the other alternative.[44] As a practical matter, it might therefore be possible to construct a *plausible* argument that a no-escape merger agreement that locks up the necessary votes constitutes an unreasonable preclusive and coercive defensive obstacle within the meaning of *Unocal*.[45]

But *Unocal* to one side, one can state with much more doctrinal certainty that the Capital Re board was still required to exercise its bedrock duties of care and loyalty when it entered the Merger Agreement.[46] If the board mistakenly entered into a merger agreement believing errone-

---

**42.** Such as no-shops, cross-stock options, and termination fees.

**43.** Corporate boards may also seek out a stock-for-stock transaction precisely for the purpose of fending off possible cash offers. That is, the entire transaction may have a defensive motive.

**44.** That is, it could be said that there is in the board's view no "threat" against which legitimate defensive barriers are needed.

**45.** *Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946 (1985); *Unitrin, Inc. v. America General Corp.*, Del.Supr., 651 A.2d 1361, 1387–88

(1995) (a defensive measure that is preclusive and coercive in relation to a threat is invalid).

**46.** *Phelps Dodge Corp. v. Cyprus Amax Minerals Co.*, Del. Ch., C.A. No. 17398, tr. at 99–100, 1999 WL 1054255, Chandler, C. (Sept. 27, 1999) (ruling at preliminary injunction hearing that although target's board of directors had no duty to negotiate in a transaction not involving a change of control or sale of the company, "[e]ven the decision not to negotiate ... must be an informed one" and that the board "should not have completely foreclosed the opportunity" to negotiate with a third party through a "no-talk" provision and that such foreclosure may constitute a breach of a board's duty of care).

ously that it had negotiated an effective out giving it the ability to consider more favorable offers, its mistake might well be found to be a breach of its duty of care. In this context where the board is making a critical decision affecting stockholder ownership and voting rights, it is especially important that the board negotiate with care and retain sufficient flexibility to ensure that the stockholders are not unfairly coerced into accepting a less than optimal exchange for their shares. As Chancellor Chandler recently noted, "No-talk provisions ... are troubling precisely because they prevent a board from meeting its duty to make an informed judgment with respect to even considering whether to negotiate with a third party." [47]

Examined under either doctrinal rubric, § 6.3 as construed by ACE is of quite dubious validity. As a sophisticated party who bargained for, nay demanded, § 6.3 of the Merger Agreement, ACE was on notice of its possible invalidity. This factor therefore cuts against its claim that its contract rights should take precedence over the interests of the Capital Re stockholders who could be harmed by enforcement of § 6.3.[48] For all these reasons, the first factor identified by Professor Regan as relevant to determining whether § 6 .3 would be enforceable weighs heavily against ACE and undercuts the probability that it could enforce the provision against Capital Re.

The second factor—timing—also weighs against ACE. The merger has not closed, the eggs have not been "scrambled," and the court would not be in the position of unscrambling them. Put another way, the transaction has not gotten to the point

where ACE's investment and settled expectations in the deal are so substantial that it is unfair for ACE's contract rights to give way to the interests of Capital Re's stockholders. In this sense, this factor operates not unlike the distinction Delaware law makes between the relief available to a stockholder plaintiff who proves that a transaction is tainted by breaches of fiduciary duty by the board.[49] If the stockholder makes his claim before the transaction is consummated, the court may enjoin the transaction.[50] If the plaintiff waits until the transaction is consummated to assert his claim, the equities usually weigh against undoing the transaction, and the plaintiff is left to the remedy of damages (if available).[51]

The third factor—the importance of the public policy interest at stake—also cuts against enforcement of § 6.3, if read as ACE claims it should be. Delaware law invests a substantial amount of authority in corporate boards to manage the affairs of corporations. But this investment of authority is dependent on the corresponding responsibility of corporate boards to exercise this authority in a careful and loyal manner. These fiduciary responsibilities are of special importance in situations where a board is entering into a transaction as significant as a merger affecting stockholder ownership rights. For that (sometimes unspoken) reason, our law has subordinated the contract rights of third party suitors to stockholders' interests in not being improperly subjected to a fundamental corporate transaction as a result of a fiduciary breach by their board.[52]

For all these reasons, I conclude that ACE is unlikely to be able to convince a

**47.** *Id.* at 99.

**48.** *QVC*, 637 A.2d at 51; *Great Expectations*, 21 Cardozo L.Rev. at 76–81.

**49.** *Great Expectations*, 21 Cardozo L.Rev. at 79–81 (pointing out this analogy and *citing to Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr., 678 A.2d 533 (1996) as well explaining the logic for this distinction).

**50.** *Id.*

**51.** *Id.*

**52.** In this regard, one additional reason why the law might also give precedence to stockholders' interests over those of acquirors is that the acquiror has the (at least theoretical) opportunity—through a tender offer or election contest—to deal directly with the "principals"—i.e., the stockholders—rather than the "agents"—i.e., the board. If an acquiror wishes to reduce the risk that the agent will exceed its authority, it has options for direct

court on final hearing that Capital Re breached a valid contractual provision by entering into discussions with XL Capital.

### B. *ACE Faces Sufficient Irreparable Harm To Justify An Injunction*

ACE has made a sufficient showing to demonstrate that, absent a TRO, it may lose a unique opportunity to acquire Capital Re at a favorable price. This court has recognized that the loss of a "unique acquisition opportunity" may constitute an irreparable injury.[53] Although ACE's stockholder agreements can be read as binding the 33.5% stockholders if this court later finds that ·Capital Re did not properly terminate the Merger Agreement, it will be very difficult in this context for ACE to actually enforce those agreements in as timely a manner as is necessary to foreclose the possibility that someone other than ACE could obtain control of Capital Re. Thus ACE has demonstrated the existence of imminent, irreparable injury, which is the "essential predicate" for issuance of the remedy sought.[54]

On the other hand, the denial of a TRO does not leave ACE with no relief to salve its wounds. Under the Merger Agreement, it will receive $25 million upon termination. If it continues to bid for Capital Re against XL Capital, that fee in essence gives ACE a $25 million bidding advantage. Coupled with its right to match any offer, ACE will still have substantial rights as a result of the Merger Agreement.

### C. *The Potential Harm To Capital Re Stockholders If The TRO Issues Is Too Substantial To Risk*

Even though ACE faces irreparable harm, that threat does not justify the award of a TRO. As explained earlier, ACE is relying on a highly problematic contractual provision it specifically demanded. It has not claimed that Capital Re's board went out and solicited XL Capital to make a bid or engaged in other conduct that would have implicated ACE's clearly legitimate contractual expectations from its merger contract.

Instead, ACE presses a TRO application premised largely on the proposition that § 6.3 means virtually nothing and the Merger Agreement has no out at all. Although this arguably goes only to the merits, the issuance of an injunction has profound implications for matters of substance and requires more than a rote application of a standard of review without concern for the actual effect ₀ of the decision on real parties with real interests.

ACE is not asking for the opportunity to place the Merger Agreement before the Capital Re electorate in an election whose outcome is uncertain and in which the Capital Re stockholders could decide to take the bird in hand (the merger) or opt for a deal with XL Capital or choose no deal at all.[55] Because ACE has the votes if the Merger Agreement is not terminated, what it ultimately seeks is an injunction from this court that will result in the

---

dealing (subject to reasonable defensive measures by the target board). Where a sophisticated acquiror chooses to deal with the directors-agents only and to enter an agreement that arguably precludes the stockholders-principals from any meaningful choice in the matter, the would-be acquiror's expectation rights in its contract are less compelling than the need to protect the stockholder-principals from improper action by the directors-agents.

**53.** *See, e.g., True North Communications, Inc. v. Publicis, S.A.*, Del. Ch., 711 A.2d 34, 44–45 (1997) (describing loss of merger opportunity that plaintiff sought to preserve as "damage" that "cannot be quantified"); *see also Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*,

Del.Supr. 506 A.2d 173, 184 (1986) (affirming Court of Chancery ruling that plaintiff demonstrated irreparable harm by, *inter alia*, showing that its opportunity to bid for Revlon would be lost absent injunction of the lock-up and other aspects of the agreement between Revlon and Forstmann).

**54.** *Cottle*, mem. op. at 6, 1988 WL 10415, at *3, Allen C. (Feb. 9, 1988).

**55.** As noted, the recent amendments to 8 *Del. C.* § 251 open up the possibility for a board to put a merger to a vote even where the board's view of the matter has changed. If Capital Re takes that route in this case, the result of the vote is foreordained because ACE will no

consummation of a transaction far less valuable to the Capital Re stockholders than the XL Capital offer.[56]

This is not a scenario that I am inclined to risk possibly bringing about by an exercise of compulsion of Capital Re's board.[57] XL Capital may decide that it does not wish to stick around and await this court's determination (in two or three weeks) of whether Capital Re will be preliminarily enjoined from terminating the Merger Agreement. ACE itself impresses upon me the vulnerability of Capital Re to market forces, and the need for Capital Re to engage in a strategic transaction rapidly. Delay could thus result in a situation where the "auction" price starts to spiral down, rather than up.

Moreover, it is extremely unlikely that my assessment of the equities will change if this matter is set down for a preliminary injunction. Thus the issuance of a TRO would in these circumstances involve the judicial imposition of risk on Capital Re without the upside of any likely prospect of providing ultimate comfort to ACE. In this respect, I do no favor to ACE to be less than candid about its prospects in prevailing on a motion for a preliminary injunction. It has much at stake here and should know whether the pursuit of a pre-liminary injunction is likely to be a possible avenue for successfully acquiring Capital Re so that it can chart its own course.

## V.  *Conclusion*

For all the foregoing reasons, ACE's motion for a TRO is denied. IT IS SO ORDERED.[58]

---

doubt prevail absent an out for the 33.5% holders, which is a matter solely within the discretion of the Capital Re board. Because the issuance of the TRO will not result in a free choice for Capital Re stockholders between the merger and the XL Capital offer, or between the merger and no transaction at all, ACE's citation to Vice Chancellor Steele's oral opinion in *Kontrabecki Group, Inc. v. Triad Park, LLC*, Del. Ch., C.A. No. 16256, tr. ruling, Steele, V.C. (Mar. 17, 1998), is inapposite. In that case, Vice Chancellor Steele's opinion left the issue to the voters in a context in which rejection of the deal management originally agreed to was possible and the voters could choose the other deal. That is not the case here.

**56.** At oral argument, counsel for ACE said that ACE would stick by its recent higher bid. I trust his word. ACE's moving papers, however, suggested an intention to seek specific performance of the Merger Agreement.

**57.** *See, e.g., R.J.R. Nabisco, Inc. Shareholders Litigation*, Del. Ch., Consolidated C.A. No. 10389, mem. op. at 31, 1989 WL 7036, at *12, Allen, C. (Jan. 31, 1989) ("the court must be alert to the legitimate interests of the public or innocent third parties whose property rights or other legitimate interests might be affected by the issuance of the remedy").

**58.** As a post-script, the reader may be interested to know that after the court's decision ACE submitted a new bid to the Capital Re board. On October 26, 1999, the Capital Re board concluded that the new ACE offer—a blended stock and cash offer designed to guarantee $14.00 a share in value—matched (or was preferable to) XL Capital's latest offer. The same day the two companies apparently executed a revised merger agreement incorporating these new terms. The new merger agreement is subject to approval by the Capital Re stockholders. As of October 28, 1999, it is uncertain whether XL Capital will make yet another offer.